PABST AIR CONDITIONING CORPORATION, PETITIONER, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19017.    Promulgated March 16, 1950.

*Louis E. Brockman, Esq.*, for the petitioner.

*Thomas R. Wickersham, Esq.*, and *Aaron S. Resnik, Esq.*, for the
respondent.

432

OPINION.

DISNEY, *Judge*: Section 722 of the Internal Revenue Code, in general, provides for the use of a constructive instead of the actual average base period net income in order to arrive at any excess in profits, provided the taxpayer establishes that otherwise the tax is excessive and discriminatory and also establishes what would be a fair and just amount representing normal earnings to be used as such constructive average base period net income. Subsection (b) (3) recites that the tax shall be considered excessive and discriminatory if the "average

base period net income is an inadequate standard of normal earnings because" the taxpayer's business "was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to (A) a profits cycle differing materially in length and amplitude from the general business cycle."

The petitioner, therefore, under the facts stipulated and found above, contends, in brief, that it is entitled to relief under section 722, Internal Revenue Code, because it was a member of the building and construction industry, which it contends was during that period cyclically depressed, and, therefore, its actual average base period net income was an inadequate standard of normal earnings for the purpose of measuring excess profits within the language of section 722 (b) (3) (A).

The respondent contends, in short, that the petitioner has wholly failed to prove a right to relief under section 722 because it has not proved that it was a member of the construction industry, has not shown that its business was depressed because of conditions in that industry, and has not shown that its profits cycle differed from that of business generally.

We pass here the question as to whether the petitioner has shown that it is a member of the building and construction industry; for, so assuming, without deciding, it still has failed in its proof, because of failure to prove that its own business was depressed "by reason of conditions generally prevailing" in such industry, within the terms and clear intent of the statute. The petitioner apparently took the view that if it was a member of an industry, and such industry was depressed, the proof was sufficient. The requirement is, however, that it show that *its* business was depressed by reasons of conditions generally prevailing in the industry. Regulations 112, sec. 35.722-3 (c), on this point, reads:

* * * The ordinary circumstances existing in the case of the industry of which the taxpayer is a member and which produce business depression *in the case of the taxpayer* must also be established by the taxpayer to have produced business depression with respect to the industry generally during the base period. * * * [Italics ours.]

Here the petitioner has not only failed to prove depression of the industry, but also has not shown that its own business was depressed. In addition, it failed to demonstrate that thereby its profits cycle was different "materially in length and amplitude from the general business cycle." We find the proof almost altogether deficient under section 722 (b) (3).

First, there is no convincing proof that the building and construction industry was depressed generally. We have no judicial knowl-

edge as to the matter on the period in question, 1936–1939, inclusive, and are not asked to take such judicial notice; and the evidence adduced is not at all, in our opinion, conclusive. It consists in certain information published as "Statistics of Income" by the Treasury Department, Bureau of Internal Revenue, showing, in substance, figures, in dollars, of gross sales, first of all nonfinancial corporations except public utilities, and then gross sales of all construction corporations, from 1919 to 1939, inclusive. Taking the average for 1922–1939 as 100 per cent, the average, for 1936–1939, is 111 per cent for the nonfinancial corporations, and 101 per cent for construction corporations. Thus, it appears that the 1936–1939 average was higher than that for the period from 1922, though higher for nonfinancial corporations than for construction corporations. No statistics are given as to net profits. We are not convinced by this showing that "conditions prevailing generally" in the construction industry showed depression within section 722 (b) (3). Regulations 112, sec. 35.722–3 (c) (1), on this matter, states:

* * * A taxpayer does not establish a claim for relief under section 722 (b) (3) (A) merely by comparing its own profits cycle, or the profits cycle of an industry of which it is a member, with one or more general business indices prepared by any public or private financial, economic, or statistical organization, and by showing a variance between its own profits cycle and such other general business indices.

Secondly, even assuming depression in the construction industry, and membership by petitioner therein, it does not follow, and the petitioner has not shown, that petitioner's business was thereby depressed, "subjecting such taxpayer to (A) a profits cycle differing materially in length and amplitude from the general business cycle." For example, if we should assume that installation of television aerials was so integral a part of the construction industry that one installing them could be termed a member of the construction industry, clearly the business of the one installing, because of the newness of the trade, might greatly increase while construction business generally was decreasing. We regard it as obvious that the statute, in so far as it deals with business depression in section 722 (b) (3), is intended to furnish grounds for relief, because of such depression of a particular industry, only to those whose businesses actually are controlled by or go along with the depression in such industry; and that if, though a graph of activity or profit in the industry were curving downward, nevertheless the graph for the business activity or profit of a particular member of the industry for some reason curved upward, such member could not, merely because of the industry's depression, show right to relief under section 722 (b) (3). That section does not confer the right solely because of membership in a depressed industry, but

appears carefully drawn to limit relief to one whose business was actually depressed by reason of general conditions in the industry. To make such a showing, from depression of the industry, logic requires establishment of a necessary relation between change in the petitioner's individual business and change in the general construction industry. This entails a demonstration that the air-conditioning business is a concomitant with the general construction industry, and goes up or down with it and roughly at least at the same rate. It is obvious, however, that with the business of the petitioner limited, under the evidence, to jobs on business buildings, but construction, in general, including so far as the evidence show other constructions such as excavations, highways, or homes, the air-conditioning business will not be reflected by such general construction industry, unless it is shown that air conditioning is, on the average, installed in such construction, homes, and other buildings, as well as business buildings, such as the theaters where much of petitioner's installation was done. If we can not take judicial notice that comparatively few homes are as yet air-conditioned, we must at least require, on this subject, proof that they are so air-conditioned, if the air-conditioning industry is to be considered depressed by conditions generally prevailing in an industry, to wit, construction, which necessarily includes construction of very many homes. It is altogether conceivable that any depression, which petitioner asserts in the construction industry in general, resulted, not as to buildings such as theaters and business buildings, where air conditioning is or may be common, but from homes or other constructions or buildings where it is or may not be usual. We have before us, on this point, no facts to demonstrate adverse or depressing effect of depression, if any, in the construction industry, upon the air-conditioning trade of the petitioner. We conclude that the petitioner has failed to satisfy the requirements of section 722 (b) (3) (A).

The petitioner also claims relief under section 722 (b) (4). So far as here involved, that section (within the text of 722 (b)) provides that the tax shall be considered excessive and discriminatory if its average base period net income is an inadequate standard of normal earnings because "the taxpayer, either during or immediately prior to the base period, commenced business * * * and the average base period net income does not reflect the normal operation for the entire base period of the business." The section goes on to provide that if taxpayer's business did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business two years before it did so, "it shall be deemed to have commenced the business * * * at such earlier time." This is the so-called "push back" rule, and upon it the petitioner relies.

The general crucial point, plainly, is whether the actual average base period net income reflects normal operations for the entire base period, or whether, *contra*, such base period net income is an inadequate standard of normal earnings.

The petitioner's contention on this issue is, in substance, as follows: That it commenced business in the middle of the base period; that by the end of the base period it had not reached a mature level of normal operations because of the fact that during the first two years it pursued a policy of bidding low on jobs in order to secure work and recommendations, and in doing so lost over $2,300 in 1938 and made only about $14 in 1939; that during two years it was progressing more rapidly than its industry, so is entitled to use the "push back" rule; that there was ample market in New York City for air conditioning; and that Pabst, a qualified expert, testified that with two years of additional experience petitioner would by the end of 1939 have reached a sales level of $330,000, with a net profit of $30,000. This, the petitioner affirms, shows, under section 722 (b) (4), that the actual average base period net income does not reflect the normal operation for the entire base period, so that the excess profits tax, if computed without benefit of section 722, is excessive and discriminatory.

Under the recent case of *Stonhard Co.*, 13 T. C. 790, persuasive reasons, supported by adequate evidence, must be shown in order to reconstruct base period net income under the "push back" rule.

The petitioner, to make its case under section 722 (b) (4) because of commencement of business within the base period, must demonstrate that its actual average base period net income was an inadequate standard of normal earnings for the entire base period. It must, of course, also reconstruct an average base period net income in order to establish a fair and just amount representing normal earnings to be used as a constructive average base period net income. Study of the evidence adduced compels the conclusion that the petitioner has not made the necessary showing.

In effect, the petitioner reconstructed the base period net income upon the testimony of Pabst that in his opinion the business if it had started with 1936 would by the end of 1939 have been earning $30,000. To this figure the petitioner applies an index of 96.5 per cent from "The Construction Industry Sales Volume" for the years 1936–1939, inclusive, to arrive at $28,950 as average base period net income, to which 10 per cent is added to "care for the industry depression, making a total reconstructed average base period net income $31,845."

Though opinion evidence has been used in general on this subject, *East Texas Motor Freight Lines*, 7 T. C. 579, it is apparent that it must have basis in the evidence, *7-Up Fort Worth Co.*, 8 T. C. 52. Therein, much as in this case, an interested officer of the petitioner ex-

pressed the opinion that if the petitioner had been organized two years earlier the volume of sales would have been a certain figure. We said that the record did not support such opinion and quoted *Arden-Rayshine Co.*, 43 B.T.A. 314, that "the establishment of an ultimate fact requires something more than a mere statement of the conclusion of the fact sought to be proved." Examination of the evidence of Pabst shows that his opinion is based as follows: That during 1939, petitioner's second year, it had sales volume of $103,119.60; that it was $44,804.37 in 1938, petitioner's first year; that this was an increase of 130 per cent; that " * * * business increased 130 percent from 1938 to 1939. From the second to the third year it increased about 80 to 100 percent. 75 to 100 percent over the second year. And the fourth year, about the same amount over the third year"; that based on those figures his opinion was that business should have increased about 80 percent in the third year over the $103,119.60 of the second year, which would amount to $182,000 for the third year, and an increase of 80 per cent in that amount would be nearly $330,000 for the fourth year; and that upon the $330,000 sales volume for the fourth year net profit after salaries and overhead would be at least $30,000. As we said of the opinion evidence proffered in the *7-Up Fort Worth Co.* case, we find these conclusions largely unsupported in the record before us, so far as under the statute we may consider it. It is clear from the above and from Pabst's testimony that he took the figures of sales volume, not only as stipulated for 1938 to 1939, but also considered the increases, as he gave them, for 1940 and 1941. We may, however, not take these post-1939 facts into consideration in determining average base period net income. Sec. 722 (a). In fact, his statement that there was an increase from the second to the third year, and from the third to the fourth year of about 80 per cent is altogether contrary to the record. The net sales as stipulated being, for 1938, $44,804.37; for 1939, $103,319.60; for 1940, $52,599.72; and for 1941, $78,319.20, it is clear that, even if the figures after 1939 were taken into consideration there was a decrease in the third year, and though there was increase of about 50 per cent thereof in the fourth year, it was still about 25 per cent less than the second year, 1939. We refer to these figures for 1940 and 1941 only because they contradict Pabst's opinion and because his opinion is affirmatively shown to be based thereon. It is true that the increase from $44,804.37 for 1938 to $103,119.60 for 1939 (which pre-1939 figures we may properly consider) justified the witness' statement "And business increased 130 percent from 1938 to 1939" (though this applies to all business, not merely air conditioning), but the next following language, as above quoted, is flatly contradictory of the stipulation. It follows not only that the witness' opinion as to income for 1936–1939 is based upon facts after 1939, but that there were no such

facts after 1939 as assumed in the formation of the opinion. Obviously we may not safely accept even an opinion that average base period net income, reconstructed, would have been $30,000 without facts, and facts properly within our consideration, to support such opinion.

Moreover, the witness' reconstruction of base period net income is based upon an index of "The Construction Industry Sales Volume," as stated by the petitioner upon brief. We thus face the question, which we found it unnecessary to resolve above in considering section 722 (b) (3), Is the petitioner a member of the "Construction Industry" as contended by it? If not, it is obvious that the index used by the petitioner should not be used. There is no showing that there are no figures available for the air-conditioning industry or for comparable concerns. On the contrary, the record shows that there are at least 3 comparable companies in New York City, and about 14 more concerns listed in the telephone directory as "Air Conditioning Contractors," whom Pabst did not recognize. Yet no evidence was adduced as to the experience of these companies. The statute does not define industry. Regulations 112, section 35.722–2 (b) (8), though recognizing that "no exclusive definition of the concept 'industry' can be constructed," goes on to state:

\* \* \* In general an industry may be said to include a group of enterprises engaged in producing or marketing the same or similar products or services under analogous conditions which are essentially different from those encountered by other enterprises. \* \* \*

Also, in the bulletin on section 722 issued by the Commissioner of Internal Revenue on November 1, 1944, and quoted by us in *East Texas Motor Freight Lines*, *supra* (though not as here follows), after pointing out that industry earnings are a source of information for determining constructive average base period net income under section 722 (b) (4), it is stated:

In most general terms an "industry" comprises a group of business concerns sufficiently homogeneous in nature of production or operation, type of product or service furnished, and type of customers, so as to be subject to roughly the same external economic circumstances affecting their prices, volume and profits. Stated otherwise, an industry will generally consist of all of the producers which compete with each other in selling essentially the same products or services in the same market. \* \* \*

These concepts of industry we find sound. They do not permit the air-conditioning industry to be regarded as the same as that of general construction or even the building and construction industry. It seems altogether plain that the construction (or building and construction) industry and the air-conditioning industry do not "compete with each other in selling essentially the same products or serv-

ices in the same market." The mere fact that the United States Department of Commerce listed air conditioning among "Special Trade Contractors" in connection with a note as to "census of construction," relied upon by the petitioner as demonstration that it is a member of the building and construction or construction industry, does not so demonstrate.

It is true that the record contains, and the petitioner relies on, certain data as to air conditioning, but in our view they are not sufficient for the purpose. Thus, we have figures as to number of installations of air-conditioning equipment in the metropolitan New York City area for 11 months of 1936, all of 1937 and 1938, and 11 months of 1939. We have also figures as to dollar volume of "air conditioning installations and related installations" in the same area for 1937, 1938, and 1939, with data not available for 1936, with a note: "The above figures include contracts pertaining to work other than air-conditioning systems." Out of "at least 41 air-conditioning contractors" doing business in New York City in 1938 and 1939, 27 filed contracts showing installation of materials and equipment for air-conditioning systems valued at $3,233,000. "Edison Electric Institute Bulletin" reported that 182 companies had reported that there were 10,000 air-conditioning installations in 1938 and 11,998 in 1939, these figures being nation-wide.[1] Thus, it appears that the record contains no complete statistics as to air conditioning, only, throughout the base period. In the absence of showing of unavailability of figures for the air-conditioning industry, or of concerns comparable to petitioner, of which the record indicates a number, we can not with logic permit the comparison with an industry obviously much broader than air conditioning. Those in the air-conditioning business plainly do not compete with the entire construction, or building and construction, industry, and statistics from the latter give no reliable comparison with the petitioner.

Again, in reconstructing base period net income, the petitioner offered evidence only as to reconstruction of net income, as a generality, with no analysis or reconstruction of costs. Cf. *East Texas Motor Freight Lines, supra,* where operating gross income, operating expenses, other income, and other deductions were disclosed. Here no evidence appears as to reconstruction of expenses, salaries, etc., though such expenses would, in the nature of things, differ from those actually paid if greatly augmented sales and income are to be considered, as contended.

Another reason appears for not accepting the petitioner's reconstruction of base period net income. The substance of Pabst's testimony

---

[1] We note that this is mere number of installations, with no indication as to dollar value, which may be more or less than in 1938.

was that through 1938–1939 the petitioner was sacrificing business for prestige; in short, cutting bids and prices in order to get business started, so that its actual profits present no adequate standard of comparison. From this he concludes that, instead of a loss in 1938 and a very small net profit of $13.93 in 1939, there would have been a net profit of $30,000 in 1939. Referring to three jobs in 1939, he said: "If we had gotten our regular price such as we got the following year, we would have made $14,000 or $15,000 more." However, he also said: "We went as high as we thought we could go and still get the work." He also stated that the three jobs were competitive bid jobs. Thus, it appears that if petitioner's bids had been any higher it would not have secured the work; therefore, would not have made the greater profit attempted now to be reconstructed; moreover, that, petitioner's bids being as high as possible yet the work be obtained, it offers no picture essentially different from its competitors. With bids nearly as high as the next, as the testimony suggests, the petitioner is seen as making all the profit it could and get any business, instead of, as contended, sacrificing about $227,000 volume of business, in 1939, for example ($227,000 being the difference between the actual business in 1939 and the $330,000 which petitioner says it could have made if it had pursued a different sales policy, starting two years earlier). The evidence fails to convince that, as a competitive bidder bidding as high as it could safely yet secure the business, the petitioner could have increased its sales for 1939 in any material amount. The record here, on the contrary, indicates that it might have made less, for lack of business.

Another reason we are unable to consider the petitioner's actual experience in 1939 as an inadequate standard of normal earnings is the long previous experience of Pabst in the same business, as Adams Engineering Co. Under Regulations 112, section 35.722–3 (d), regard may be had to the experience and earning capacity of an enterprise of which the taxpayer's business is a continuation, and if a corporation is reorganized in the base period into two new corporations the excess profits net income of each may be determined by reference to the former corporation. Pabst was sole stockholder and manager and operating and directing head of the petitioner. He had been from 1929 until April, 1936, sole owner and operating and directing head of Adams Engineering Co. He then sold one-half of his stock. He remained president until November, 1937, when he sold the rest of his stock. This was at practically the same time as the incorporation of petitioner, very shortly before it started business in January, 1938. The only essential difference between Adams Engineering Co. and the petitioner was that Adams Engineering Co. sublet its sheet metal and piping

work. From 1929 to 1937, inclusive, Adams Engineering Co. had a net profit in only one year, 1934, when it made $37.82. The facts in that regard have been found. They are remarkably similar to the experience, during the next two years, 1938 and 1939, of the petitioner, also under Pabst's management. We can not consider the difference between the air-conditioning business of Adams Engineering Co., with subletting of sheet metal and piping work, and the air-conditioning business of the petitioner as furnishing reason for declining to consider the previous experience in attempting to arrive at the norm in the base period years; and we note that in 1936 and 1937, the first two base period years, Adams Engineering Co. had respective net losses of $7,284.28 and $49.27.

For all of the above reasons we conclude and hold that the petitioner has failed to show that its average base period net income during 1938 and 1939 did not reflect the normal operation for the entire base period, and has failed to establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during the excess profits tax period.

We having found that excess profits credit for each of the taxable years based on invested capital under under section 714 is greater than under section 713,

*Decision will be entered on the facts above found that the petitioner is not entitled to excess profits tax relief pursuant to section 714 of the Internal Revenue Code.*

Reviewed by the Special Division.