The Austin Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 26835.   Filed June 30, 1954.

*Thomas V. Koykka, Esq., Walker H. Nye, Esq.,* and *George P. Bickford, Esq.,* for the petitioner.

*Clarence Price, Esq.,* and *Stanley Ozark, Esq.,* for the respondent.

708

710

## OPINION.

Van Fossan, *Judge:* The petitioner seeks relief from excess profits taxes for the years 1940 and 1941 under the provisions of section 722 of the Internal Revenue Code.

To achieve its objective, the taxpayer must establish that the excess profits tax computed without the benefit of section 722, Internal Revenue Code, is excessive and discriminatory and it must further establish a fair and just amount representing normal·earnings to be used as a constructive average base period net income. The petitioner initially relies upon the provisions of subsection 722 (b) (3) (A), which sets forth the proposition that the excess profits tax shall be considered

excessive and discriminatory if the taxpayer demonstrates that its average base period net income is an inadequate standard of normal earnings because its business was depressed in the base period by reason of conditions generally prevailing in its industry, subjecting the taxpayer to a profits cycle differing materially in length and amplitude from the general business cycle. The burden is thus placed upon the petitioner under this subsection to prove at the outset that its business was depressed during the base period because of the factor cited. A comparison of the taxpayer's earnings over the period 1922–1939 with its earnings during the base period manifests the existence of a depression in the taxpayer's business during the years 1936–1939.

The taxpayer's excess profits net income, exclusive of Government bond interest and income from the operation of the Carnegie buildings for the base period, averaged 79.71 per cent of the average for the extended period of 1922–1939. Included within the figures relating to the petitioner's excess profits net income is interest received upon advances made to the Austin Realty Company and the Austin Securities Company. These advances were made as an integral and necessary step in the petitioner's effort to obtain and carry out construction contracts. Income from the petitioner's subsidiaries is not included in the determination of the taxpayer's excess profits net income, but the interest received from these subsidiaries on legitimate and necessary loans must be included in the amount determined as the excess profits net income of the petitioner. Similar treatment must be accorded to the interest received upon advances to the Owners Investment Company inasmuch as these loans were made in the process of the construction by the petitioner of the Carnegie buildings. However, even if the petitioner's income from sources other than what can be strictly construed as construction activity is eliminated from the determination of the petitioner's income during these years, the average for the extended period is $307,363 and for the base period $242,446, or 78.88 per cent of the average for 1922–1939. A similar result is obtained from the examination of the ratio of income arising solely from construction activity to the value of assets available for construction, exclusive of all nonconstruction investment. This comparison reveals that the average ratio for the period 1922–1939 was 16.10 per cent whereas the base period average ratio was 14.52 per cent. Upon any measurement of the petitioner's income, it is evident that its construction business was depressed to some extent during the base period.

The respondent urges that the petitioner's business was not depressed during the base period because its annual average sales were higher during those years than in the extended period of 1922–1939. Sales, although indicative, are not the sole criterion in the determination of

whether the petitioner's business was depressed. *A. B. Frank Co.*, 19 T. C. 174. Examination of the petitioner's sales record against the background of its increased competitive business, as evidenced by the figures relating to the petitioner's sales as a percentage of the value of total industrial construction, demonstrates that the increase in average sales was not proportionate to the improvement in its competitive standing. During the extended period, the petitioner did 2.55585 per cent of such business whereas during the base period it performed almost 4 per cent of the industrial construction. Upon the evidence presented, we are of the opinion that the petitioner has proved that petitioner's business was depressed during the base period.

The petitioner must also prove that it is a member of an industry and that its business was depressed by reason of conditions generally prevailing in that industry subjecting it to a profits cycle differing materially both in length and amplitude from the general business cycle. *Pabst Air Conditioning Corporation*, 14 T. C. 427. The facts disclose that petitioner was a leading member in the construction industry. It built factories, office buildings, warehouses, and other commercial and industrial buildings. That the construction industry was depressed during the base period as compared to the extended period, is evidenced by the averages of the indices for those periods. The expert economic witnesses called by the parties herein, although disagreeing on the methods of measuring cycles, were in agreement that industrial production is the correct measure of the cycle of general business to be employed in a comparison with the construction industry. To determine the cyclical pattern of the petitioner's industry, figures were submitted by the taxpayer with regard to the value of new private construction, nonresidential construction, general industrial construction, and industrial construction including warehouse, office buildings, and loft construction. These figures were converted to reflect physical volume in order to establish a competitive basis with the indices of industrial production.

We do not concur, however, in the taxpayer's view that the representative indices submitted establish a variant profits cycle for the taxpayer's industry. Nor do we concur that the figures relating to the petitioner demonstrate a variant profits cycle for it.

The indices of industrial production representing the general business cycle applicable to this type of industry reveal a pattern or series of rising and falling trends over periods of three to six years. Troughs occurred in 1921, 1924, 1927, 1932, and 1938. The highest peak was reached in 1929. The petitioner contends that this series of upward and downward trends represents the general business cycle. If this be accepted, it becomes evident upon examination that the petitioner and its industry follow very similar patterns or cycles.

Upon turning to the indices of industrial construction, largely representing construction of factories, and the indices of industrial construction and construction of warehouses, offices, and loft buildings, which were submitted by the petitioner, we find, if any pattern or cycle appears, one which is closely parallel to that of general business. The indices of industrial construction and those of industrial, warehouse, office, and loft construction are chosen for comparison because they most nearly represent the petitioner's industry. The index figures submitted by the petitioner with respect to new private construction, which exclude only public construction, maintenance, and repairs, and the indices of nonresidential construction, which further exclude residential building, are of little value for our purposes because they cover too broad a field. The petitioner, although not restricting its activities, engaged principally in industrial and commercial building and it is these statistics which must be used in any proper comparison.

Examination of the indices of industrial construction and industrial, warehouse, office, and loft construction, in comparison to the index of general business, reveals that both clearly followed the trends and fluctuations of general business during the years submitted. Troughs were reached in all three in 1924, followed by a rise through 1926 and a decline again in 1927. A further increase to a peak occurred in 1928 and 1929 for all three sets of indices which was followed by a decline to a trough in 1932. With the one exception of the year 1935, for the indices of petitioner's industry, all three indices continued a rising trend to 1937 before turning down in 1938 and increasing again in 1939. The lengths of any cyclical pattern demonstrated are strikingly similar upon the evidence submitted by the taxpayer. Although some differences in amplitude may be reflected upon study of the indices, it must be borne in mind that the statutory provision requires a cycle differing materially in length as well as in amplitude from the general business cycle. *Avey Drilling Machine Co.*, 16 T. C. 1281. No such material variance is shown here and it follows that petitioner's depressed business could not have been caused by conditions generally prevailing in its industry subjecting the taxpayer to a profits cycle differing materially in length and amplitude as is required under the statute.

The petitioner argues that fluctuations of minor degree in a subject matter as narrow as one industry must be discounted in making comparisons with a wide statistical universe where offsetting factors cancel each other out. The taxpayer thus argues that its industry experienced only one cycle and part of another during the years 1922–1939. Although the observation that minor fluctuations should be discounted may be conceded, it does not aid the taxpayer in the present instance.

The indices submitted by it for its industry show increases and decreases of considerable size which cannot be glossed over consistently with the taxpayer's view that general business experienced four cycles during this same period. A decline of more than 17 points in industrial construction in 1924 and a decrease in that year of more than 9 points in industrial, warehouse, office, and loft construction occurred at the same time that the indices of general business reflected a decline of over 6 points. Similarly in 1927, the industrial production index dropped slightly more than 1 point while the industrial construction index declined almost 7 points and the factory, warehouse, office, and loft construction index declined more than 2 points. In such instances of marked change in trend, the argument is unavailing that the indices representing the petitioner's industry did not undergo a significant change when compared to those of industrial production.

Other evidence, including much offered by the taxpayer, substantiates the conclusion reached above. A comparison of the net income of the construction industry and of all corporations demonstrates that the petitioner's industry closely followed the trends and fluctuations manifested by all corporations. Declines were suffered in net income of the construction industry in 1926 and by all corporations in 1927. After 1928, when the petitioner's industry again suffered a decline, both sets of indices followed the same pattern, going up together to the peak of 1929 and down to the trough of 1932. Following an upswing in 1933, peaks were reached by both in 1937 followed by a decline in 1938 and recovery in 1939. We are unable to find any variance, which might be designated as material, in the length of any cyclical pattern which is otherwise evidenced.

It is our conclusion that the taxpayer has not demonstrated a profits cycle of its own differing materially in length and amplitude from the general business cycle. The figures submitted with respect to the petitioner's sales for use in comparison with the value of industrial construction demonstrate that the Austin Company followed a pattern similar to that of its industry. Declines were suffered in industrial construction in 1924 and 1927 while the taxpayer's sales decreased in 1928. Both indices manifested a rising trend in 1929 followed by another decline in 1930 which continued through 1932 before initiating an upward turn in 1933. This rise continued for the petitioner's sales until 1938. Industrial construction fell off in one year, 1935, before continuing its rise until 1938 when both indices declined and then recovered in 1939. With minor variations, it is evident that the taxpayer followed its industry in the length of any cycle manifested. The industry, as we have seen, followed the pattern of general business as to the periods of cyclical behavior. Further evidence of the similarity of the petitioner's pattern with that of its industry is shown by the comparison of the petitioner's net income (per revenue agent's

reports) with the net income of the construction industry. Decreases occurred in the petitioner's net income in 1925 and 1926 and for its industry in the latter year. Another decline occurred for both in 1928 and a downward trend was entered by both in 1930 which continued for both through 1933. An upward swing occurred in 1934 which endured until 1938 followed by a rise again in 1939.

When the petitioner's profits are compared with those of all corporations, it is apparent that, like its industry, it followed the general business pattern rather closely. The taxpayer's net income (per revenue agent's reports) declined in 1925 and 1926 from a rising trend in the early 1920's. The net profits of all corporations declined in 1924 and again in 1927—the petitioner suffering another decrease in profits in 1928. Both reached a peak in 1929 and then entered into a declining trend in profits continuing until 1932 before rising again until 1938 when another decline occurred. Recovery was made by both in the following year. Similarly, comparison of the petitioner's excess profits net income with that of all corporations reveals a likeness in the length of any cyclical periods which might be demonstrated. Both the petitioner and all corporations followed an increasing trend after 1922 which lasted until 1924 for all corporations and until 1925 for the petitioner. The excess profits net income for all corporations declined again in 1927, the petitioner suffering a decrease in 1928. Again both reached peaks in 1929 and entered into a period of decline in 1930 which continued for the taxpayer through 1934 and for all corporations through 1932 until an upward turn was taken in 1933. This upward trend continued for both until 1938 followed by a recovery again in 1939. Although some variations may exist in the exact years when a change in profits trend occurred, the length of cyclical pattern, if there be such in the present instance, is very similar. Upon the several bases of comparison, we are unable to find that the petitioner corporation or its industry experienced a profits cycle differing materially in length from that of general business. The principal requirement of variance is precluded under any view of cyclical behavior when the subjects of comparison follow each other so closely in trend and fluctuations. We must conclude, therefore, that the taxpayer was not depressed during the base period because of conditions generally prevailing in its industry subjecting the petitioner to a variant profits cycle. The depression was, therefore, not caused by the factors stated in subsection (b) (3) (A) of the statute and relief cannot be granted upon that basis.

The petitioner's application included an alternative ground for relief under section 722 (b) (3) (B) on the basis of sporadic profits. No argument is made on this point and the evidence presented does not establish a basis for such relief.

We turn then to petitioner's second principal ground for relief, that the contract entered into with the Dow Chemical Company in February 1939, constituted a change in the character of its business, entitling it to relief under the provisions of section 722 (b) (4). The Dow continuing construction agreement granted the petitioner the opportunity to obtain construction work over a period of years without the necessity of negotiating and bidding for each particular job. The agreement offered the petitioner a profit on the construction work without the risk of sustaining losses on the project and also enabled the petitioner to form close relations with the customer. The Dow Chemical Company, relying on the contract, disbanded most of its own construction force which had performed its work in the past.

Although the advantages presented by this contract to the taxpayer were no doubt of helpful importance, we are of the opinion that they do not constitute a change as is envisaged by section 722 (b) (4). The contract provided for a change in the petitioner's method of obtaining business with respect to one customer only. The petitioner did not alter the type of work it had performed in the past nor did it enlarge its capacity or effect a change in its management. A new and advantageous method of securing its business did not alter the character of the business carried on by the Austin Company. Its method of operation was changed only with respect to obtaining certain business, not with the method of performing its work. To qualify, the change must be substantial and not be such as might occur in normal and ordinary course. *Newburgh Transfer, Inc.*, 17 T. C. 841. The contract may have represented a significant change to the Dow Chemical Company which disbanded its construction force but the taxpayer did not undergo a similar alteration. In our opinion, the change, if it can be so designated, was insufficient to warrant inclusion within the meaning of the provisions of section 722 (b) (4). The cases cited by petitioner, *Packer Publishing Co.*, 17 T. C. 882, and *Wisconsin Farmer Co.*, 14 T. C. 1021, differ basically from the present factual situation and are not controlling authority to the contrary.

If it be assumed that a sufficient change in the method of operation occurred, it is noteworthy that a similar event transpired prior to the base period upon the entrance into the contract with Continental Can Company in 1935. No argument is made for relief on the ground that a statutory change occurred in 1935. We conclude that the petitioner does not qualify for relief under the provisions of section 722 (b) (4).

One further contention is voiced by the petitioner to the effect that if the taxpayer is not entitled to relief under the provisions of section 722 (b) (3) or (b) (4), relief should be granted under the "any other factor provision" of section 722 (b) (5). It is sufficient to say in this regard that relief cannot be granted upon a combination of

factors previously examined and held insufficient under other provisions of section 722. *General Metalware Co.*, 17 T. C. 286; *Granite Construction Co.*, 19 T. C. 163.

Failure to establish that the tax computed without the benefit of section 722 is excessive and discriminatory obviates the necessity of determining what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*