CALDWELL-CLEMENTS, INC., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 51570.   Filed January 22, 1957.

*Paul D. Seghers, Esq.*, and *William J. Reinhart, Esq.*, for the petitioner.

*Martin D. Cohen, Esq.*, for the respondent.

696

KERN, *Judge:* The petitioner was organized July 13, 1935, by two former editorial employees of McGraw-Hill Publishing Company, Inc., who had worked together for many years in that company as publisher and as editor of technical magazines dealing with the fields of radio and electronics. The petitioner was able to commence publication in September 1935 of a magazine, Radio Today, designed for radio sales and service dealers, and also to commence planning and other preparatory work toward the publication of a technical magazine intended for a highly selective audience of top level engineers

and designers. Due to the competitive activities of McGraw-Hill, petitioner's officers felt that it was not possible for the petitioner to bring out this new magazine Electronic Industries until November 1942 when it scored an immediate financial success—an unusual event in the publishing business which may be explained by the rapid progress and flourishing conditions in the electronics industry caused by the war.

In the instant proceeding, the petitioner seeks a reduction in its excess profits tax for 1943 under the relief provisions of section 721 of the Internal Revenue Code of 1939 on the ground that a portion of its income for that year was abnormal and was attributable to prior years during which the magazine Electronic Industries was under development.

As we stated in *E. W. Williams Publications, Inc.*, 25 T. C. 282, 290:

In order to obtain relief, the taxpayer must establish within the framework of the statute and applicable regulations, (1) the class and amount of abnormal income in the taxable year; (2) the amount of net abnormal income derived therefrom; and (3) the portion of net abnormal income which is attributable to other taxable years. [Citations omitted.]

The petitioner and the respondent have joined issue at every step of the way through the statutory pattern of section 721 and the regulations issued thereunder. Before proceeding further, we shall note briefly the specific points in dispute.

1. The petitioner elected to classify its purported abnormal income from its magazine Electronic Industries or, in the alternative, from all of its magazines, under section 721 (a) (2) (C).[1] It contends that the preparatory editorial and prepublication work of its officers and employees on Electronic Industries prior to 1943 resulted in the receipt in that year of the class of abnormal income which is defined in section 721 (a) (2) (C) as a "separate class * * * resulting from * * * research, or development of tangible property, * * * or processes, * * * extending over a period of more than 12 months." In the alternative, it argues that if it should be determined that the income received in 1943 was not of the class described in section 721 (a) (2) (C), then it was not of a class described in any of the subparagraphs A through F of section 721 (a) (2) and was, therefore, classifiable in accordance with the last sentence of section 721 (a) (2).[2] No regulations have been issued under this sentence of the statute.

The respondent, after first contending that petitioner had no income in 1943 of any class defined as abnormal in section 721 (a) (2), con-

[1] SEC. 721 (a) (2) (C).
Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; * * *
[2] The classification of income of any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary.

tends that the petitioner is bound by its irrevocable election to classify its income from Electronic Industries under section 721 (a) (2) (C) and cannot seek relief in the alternative under the last sentence of section 721 (a) (2). He further argues that class (C) income does not include "the type of activity performed by the petitioner in connection with the publication and promotion of a magazine such as 'Electronic Industries,'" a conclusion suggested by dictum in our Opinion in *E. W. Williams Publications, Inc., supra*, at page 291, and urges that to treat the petitioner's gross income from advertising and sales of a magazine as a separate nonspecific class under section 721 (a) (2) would be too broad a classification under the statute.

2. Assuming that the petitioner qualified for relief under section 721 (a) (2), the respondent argues next that the petitioner has failed in its burden of proving what portion of its income in 1943 was not attributable to such factors as management, salesmanship, and goodwill, since income arising from such sources is not of a type for which relief is granted under section 721 (a) (2) (C). *E. W. Williams Publications, Inc., supra.* The petitioner contends that it has proved as far as it is possible in any case to do so the extent to which its income in 1943 is not attributable to these factors, and requests this Court to make its own determination, based upon the entire record, which will make an allowance for the income-producing effect of these elements.

3. Assuming, *arguendo*, that the petitioner is able to establish the amount of its net abnormal income for 1943, as defined under section 721 (a) (3), the respondent argues that the petitioner has failed in its burden of proving what, if any, portion of such net abnormal income was not due solely to an improvement in business conditions. Regs. 112, sec. 35.721-3. The parties are in dispute as to the computation of a factor of business improvement which will give effect to such elements as high prices, low operating costs, and increased physical volume due to increased demand or decreased competition.

4. Finally, again assuming *arguendo* that all previous contested points have been settled in the petitioner's favor, the respondent contends that the record affords no satisfactory basis upon which any net abnormal income that may be found for 1943 can be apportioned to prior years.

After careful consideration of the entire record and for the reasons set forth below, we are in agreement with respondent's final contention and must deny the petitioner the relief requested under section 721. It is, therefore, unnecessary for us to consider or decide the various other points in issue.

The excess profits tax was first enacted by the Second Revenue Act of 1940 and was made effective for taxable years beginning after December 31, 1939. Under the provisions of section 721 (c), which the petitioner desires to use in computing its excess profits tax for

1943, it is necessary to determine the amounts by which its excess profits taxes in each of the years 1940 through 1942 would be increased by the inclusion in the gross income of the respective years of the portion of the net abnormal income for 1943 attributable thereto. The rates at which the excess profits tax was imposed varied in each of the years 1940 through 1943. Sec. 710, as amended. It is, therefore, essential to the success of the petitioner's case that it establish the amounts of net abnormal income derived in 1943 attributable to each of the years prior thereto in which the excess profits tax was in effect so that the excess profits taxes for those years can be recomputed giving effect to the inclusion of the proper portion of the net abnormal income received in 1943. Cf. *Ramsey Accessories Manufacturing Corporation*, 10 T. C. 482, 488–489. Furthermore, it appears from the exhibits annexed to the stipulation of facts that the petitioner had losses in 1940 and 1941 and net income in 1942 so that the attribution of the net abnormal income from 1943 to the correct prior years is of added importance to the computation of the petitioner's excess profits tax for 1943 under section 721 (c).

Regulations 112, section 35.721–7, pertaining to abnormal income from research or development, provide, in part, as follows:

In general, an item of net abnormal income of the class described in this section is to be attributed to the taxable years during which expenditures were made for the particular exploration, discovery, prospecting, research, or development which resulted in such item being realized and in the proportion which the amount of such expenditures made during each such year bears to the total of such expenditures.

This method of allocating net abnormal income of the taxable year to prior years has been followed by this Court. *W. B. Knight Machinery Co.*, 6 T. C. 519; *Rochester Button Co.*, 7 T. C. 529.

In the instant case, there is no satisfactory evidence in the record which establishes either the total amount expended on any research or development activities in connection with Electronic Industries or the amounts expended in any of the years prior to 1942. The petitioner has suggested no other method by which we may attribute any net abnormal income derived in 1943 to the respective prior years, and we know of none.

The parties have stipulated that with the exception of a ledger sheet of September 1937 showing expenditures of $394.34, the petitioner's books "prior to 1942 do not segregate or show in any identifiable manner the amount of expenses incurred in the development of 'Electronic Industries' or 'Engineering Today.'" The only evidence in the record with respect to the amount expended on "research or development" in connection with the new magazine is the testimony of Clements, the petitioner's president since its inception. In response to a question from the petitioner's counsel as to whether he could state

approximately how much it cost to develop Electronic Industries, Clements testified that it would be very difficult for him "to state precisely" unless he could include an estimate of the time put in by himself and Caldwell, and that if such time were considered "you would probably have six figures." When asked for specific items for which money would have been spent in addition to the time of the petitioner's two chief officers, Clements testified that "perhaps the largest single item [aside from the officers' time] was the development of a mailing list," the culling of the names of 12,000 to 14,000 top level executive engineers and designers from a list of 100,000, "the questionnairing, personal visits, postage, then putting all of that data on addressograph plates, that could have cost anywhere from $30,000 to $40,000."

Clements also testified as follows in response to a question by the petitioner's counsel as to what percentage of the total amount of development work was performed during the years 1940 through 1942, inclusive:

A. Mr. Reinhart, I could only give you a wild guess based on developmental work on many magazines, sort of a crescendo. I'm pretty certain we knew in 1940 that we were going to start this publication and we knew also in the year we were just started we would have our greatest expense. Now, if you mean in time from '35 or '37 up to '42, it would be very difficult to break down, but I should say the three years subsequent to the first issue, we probably did 50 per cent of our work—

Q. The three years subsequent to the first issue?

A. Prior to the first issue. I beg your pardon, and 1942, the key year, we probably did somewhere around 20 or 22 per cent and a shorter or a smaller percentage in the years prior. Possibly 14 or 16 and down to 10, but that again I say is a guess.

Q. Was any developmental work done after November of 1942?

A. What do you mean by "developmental work", Mr. Reinhart?

Q. The development of the magazine as distinguished from the promotion of the magazine.

A. Well, it's like birth. I call the developmental period the incubation. When the baby was born in November 1942, the full momentum was there and it was then a matter of our monthly editorial service, building paid subscriptions. I don't think we had any developmental expenses after November 1942.

Q. Have you any way of knowing how much of the total cost of developing the magazine contributed to those years, 1940, '41 and '42?

A. Well, Mr. Reinhart, you have many intangibles. The developmental work of our publications is quite different with the experience in the consumer field. In the consumer field you can get an idea for a pulp magazine and you can publish it in a few weeks, but I believe our major expense was the many, many years' experience we had of knowing what to do and how to spend our dollars more efficiently. I would say possibly 50, 60 per cent.

Q. During those three years?

A. Yes, sir.

Clements further testified that he was "afraid to hazard a guess" as to what degree the reputations and experience of himself and Cald-

well were encompassed in the development work on Electronic Industries and that he "could only hazard a guess" as to how much the income derived from Electronic Industries in 1943 was the result of prior development work.

It is apparent from Clements's testimony that he had no clear understanding of what constituted research and development expenditures in connection with the preparatory work on the magazine as distinguished from those which should be classed as promotional or management, salesmanship, or goodwill. His testimony consisted entirely of a number of uncorroborated generalized statements admittedly based largely, if not completely, on guesswork. It amounted to nothing more than an expression of opinion lacking any basis in the evidence, and we cannot accept it as satisfactory evidence of the proportions in which any development expenses are attributable to years prior to 1943. See *Pabst Air Conditioning Corporation*, 14 T. C. 427. We have no knowledge of the specific items or amounts considered by Clements in "guessing" at the percentages of development work attributed by him to these years and we cannot, on this record, make the findings of fact as to such percentages required for an allocation to each of the prior years of any net abnormal income which the petitioner might have derived in 1943. *Crowell-Collier Publishing Co.*, 25 T. C. 1268. Thus, even if the petitioner successfully cleared all other hurdles, it cannot succeed absent a basis upon which we can allocate any net abnormal income for 1943 to the prior years, *A tlumor Manufacturing Co.*, 12 T. C. 949, and relief under section 721 must be denied.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*