MAURICE A. WHITE, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36562. Filed April 30, 1957.

*Grover D. Rose, Esq.,* for the petitioner.
*David H. Nelson, Esq.,* for the respondent.

238

OPINION.

MULRONEY, *Judge:* A portion of the deficiency determined by the respondent for the period April 7 to December 31, 1942, was due to "standard issue" adjustments. No error was assigned by White in

the petition to this Court as to these adjustments and he contends that this portion of the deficiency is now barred by the statute of limitations. His argument on brief is as follows:

In the case at bar, the time for the assessment of taxes against American [White's transferor] had been extended by written consent of the parties to June 30, 1951. The respondent's deficiency notice—the 90-day letter—was mailed June 14, 1951. Thereupon, the period within which an assessment might be made was suspended during the 90-day period within which the taxpayer might file a petition for redetermination by the Tax Court, plus 60 days thereafter, plus the 16-day period between June 14, 1951 and June 30, 1951, or, in other words, to November 27, 1951. Of course, if within the 90-day period allowed by law the taxpayer had filed a petition putting the standard issue adjustments in issue, then the Commissioner could not have made an assessment until after the decision of the Tax Court had become final, but since the petitioner in this case did not put any of the standard issue adjustments in question, the time within which an assessment arising out of those issues could be made expired November 27, 1951.* * *

A similar argument was rejected by this Court in *Green Spring Dairy, Inc.*, 18 T. C. 217, modified 18 T. C. 929, affd. 208 F. 2d 471. Also, it is obvious that in this transferee proceeding the respondent can make an assessment against White, the transferee, only if transferee liability in some amount results from this trial. We hold that no portion of the deficiency determined by the respondent is barred by the statute of limitations.

White seeks relief from excess profits tax for the period April 7 to December 31, 1942, under section 721 of the 1939 Code, which section is designed to afford relief to a taxpayer who receives income in any taxable year which is abnormal within the meaning of the statute. Abnormal income is defined in section 721 (a) (1) as "income of any class includible in the gross income of the taxpayer for any taxable year * * * if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years * * *." Several classes of income are described in section 721 (a) (2) which provides, in addition, that the "classification of income of any class not described * * * shall be subject to regulations prescribed by the Commissioner * * *." Relief is granted only for net abnormal income, defined in section 721 (a) (3),[1] which is attributable to other taxable years under section 721 (b).

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

* * * * * * *

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the

To obtain relief it is essential for a taxpayer to establish (1) the class and amount of abnormal income in the taxable year; (2) the amount of net abnormal income computed therefrom; and (3) the portion of net abnormal income which is attributable to other taxable years. *Caldwell-Clements, Inc.*, 27 T. C. 691; *E. W. Williams Publications, Inc.*, 25 T. C. 282; and *Powell-Hackney Grocery Co.*, 17 T. C. 1489.

At the outset, we have serious doubts that section 721 can apply to a corporation which, like American, only has a corporate existence of approximately 9 months in 1942. As we have pointed out, relief under this section is granted only for net abnormal income which is attributable to other taxable years, and it is difficult to see how a corporation with no prior or subsequent existence can ever qualify. There is no statutory authority for attributing any net abnormal income in a situation like this to any other taxpayer, and we have been presented with no reasonable basis for doing so.

Assuming, *arguendo*, that section 721 is applicable here, we do not believe that there has been established any right to relief under section 721. The argument presented by White falls short in several respects. First, White is obscure as to the class of income he hopes to establish. He begins with the fact, which is not disputed by the record, that *all* of American's income for the period April 7 to December 31, 1942, was from the manufacture and sale of special gears. In effect, all of the income of American during this period is considered by White as establishing a class of income for purposes of section 721 (a) (3). This does not comply with the requisites of the statute. In *Producers Crop Improvement Association*, 7 T. C. 562, 566, we pointed out that the "class of income" described in section 721 (a) (1) and (b) is a "class includible in the gross income." Similarily, in *Eitel-McCullough, Inc.*, 9 T. C. 1132, 1147, we said:

A taxpayer has "abnormal income" under section 721 (a) (1) only if the income of the taxable years and that of the base period to which the statutory formula is to be applied be "recognized as a separate class." *Geyer, Cornell & Newell, Inc.*, 6 T. C. 96. The statute by its terms requires identification of a "class" of income, either of any class described in subsections (a) (2) (A) to (F), inclusive, or of some other class under the regulations prescribed by the Commissioner with the approval of the Secretary. * * *

Nor can White establish a separate class of income within section 721 (a) (2) (C) which creates as a class the "[i]ncome resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months." Amer-

normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

ican, White's transferor, was in existence only during the period April 7 to December 31, 1942. Prior to that, White had engaged in the manufacture of special gears as an individual proprietor. It has been held by this Court that any research and development must be that of the taxpayer, not its predecessor. *Electronic Mechanics, Inc.*, 15 T. C. 489.

Assuming, however, that a class of income has been properly established, another serious obstacle appears. White cannot be given section 721 relief unless he can establish that a portion of the net abnormal income of the taxable year *is attributable to other years*. Section 721 (b) provides that the net abnormal income attributable to other years shall be determined under regulations prescribed by the Commissioner. The pertinent regulations, Regs. 112, sec. 35.721–3, provide, in part, as follows:

To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for * * * the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 percent of the average income of the same class for the four previous taxable years solely *because of an improvement in business conditions*. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. * * *

We have previously sustained these regulations of the respondent as valid. *Soabar Co.*, 7 T. C. 89.

We have examined the record carefully and must conclude that any net abnormal income of American for the period April 7 to December 31, 1942, was due to an improvement in business conditions, and, consequently, no part of it can be attributed to years other than the taxable year. It is obvious from the record that this country's preparation for war, and the war itself, had a tremendous effect on business conditions in general. A manifestation of this appears from the sales of White and American. In 1940 White's net sales were $292,060.69 and gross profit was $96,881.24; in 1941, net sales were $775,049.35 and gross profit was $236,668.21; from January 1 to April 9, 1942, White's net sales were $513,916.42 and gross profit was $153,183.88; and from April 7 to December 31, 1942, the taxable period before us, American's net sales were $2,519,112.06 and gross profit was $504,643.96. White has failed to prove what, if any, portion of the net abnormal income for the period April 7 to December 31, 1942, was not due solely to an improvement in business conditions. We think it is inescapable that the greater profits earned in the taxable period before us were due to the improved business conditions stimulated by the war, and other factors present during the taxable period, and

Congress clearly intended the excess profits tax to apply to such increases or excess profits. See H. Rept. No. 146, 77th Cong., 1st Sess. (1941–1 C. B. 557). White has failed to show that any part of the net abnormal income is attributable to other years under section 721 (b), and we conclude that his claim for relief must be denied.

White also seeks relief under section 722 (b) (4) of the 1939 Code. Since this is a transferee proceeding, it is necessary to clarify some of the jurisdictional aspects. Section 722 (d) provides, "The benefits of this section shall not be allowed unless the *taxpayer*" within the prescribed period "makes application therefor in accordance with regulations prescribed by the Commissioner * * *." (Emphasis supplied.) We are satisfied from the evidence before us that the application for relief was properly made by American, through White acting under proper authority as president and treasurer of the American Gear and Manufacturing Co. Also, it must be emphasized that in this proceeding, which is based upon the respondent's notice of transferee liability to White, there can be no decision that White is entitled to any overpayment of tax for the period involved. White, as transferee, is here contesting a transferee liability, and the most he can establish is that there is no such liability. Beyond this we cannot go in a proceeding of this nature.

We turn now to a consideration of the arguments presented under section 722 (b) (4). American, which was White's corporate transferor, had an excess profits net income for the taxable period April 7 to December 31, 1942, in the amount of $322,182.58. Its excess profits credit computed under the invested capital method, section 714 of the 1939 Code, was $34,704.78. The excess profits net income of American's qualified component for the base period, 1936 through 1939, without the adjustments necessary to place such component (White) on a corporate basis under the provisions of section 742 (g) of the 1939 Code, was $16,999.63 in 1936, $18,506.55 in 1937, $13,812.31 in 1938, and $14,294.42 in 1939, averaging $15,903.23 over the base period. American's excess profits tax liability for the taxable period, as finally determined by the respondent, under section 710 (a) (1) (B) of the 1939 Code (80 per cent limitation rate), was $222,592.51. American's effective credit through the operation of the 80 per cent limitation was approximately $87,700.

White contends that he changed the character of his business during the base period and bases his contention on (1) the change in 1937 from retail sales of gears to the manufacture of special gears, (2) establishing in 1938 and 1939 a new system of distribution for his products, (3) the publication and distribution of a special gear catalogue in the last month of the base period, and (4) a commitment prior to January 1, 1940, to expand his capacity for production by the acquisition of new space. He argues that, due to the changes in char-

acter, his business did not reach, by the end of the base period, the earning level it would have reached if such changes had been made 2 years earlier, and that if such changes had occurred 2 years earlier White's business would have reached, in the last base period year, net sales of $1,915,200 and net earnings of $385,147.

Respondent concedes that there was a change in the character of White's business during the base period through the change "from jobbing to manufacturing, and possibly the signing of distributors." This, however, is merely one qualifying factor under section 722 (b) (4). To qualify for relief under section 722 White must show not only that its average base period net income is an inadequate standard of normal earnings, but must also establish what would be a fair and just amount representing normal earnings, and then, as we stated in *Mokry & Tesmer Machine Co.*, 23 T. C. 12, 18, "there is still no relief under section 722 unless the excess profits credit, based upon the constructive average base period net income which is established, is greater than the excess profits credit computed without the benefit of section 722." American's credit under the invested capital method in section 714, which method produced a more favorable credit than one computed under the income method in section 713, was $34,704.78. However, due to the operation of the 80 per cent limitation in section 710 (a) (1) (B), American's effective credit was approximately $87,700. Consequently, to obtain relief under section 722, White must establish a credit greater than the effective credit of $87,700, already received by him, as well as the invested capital credit of $34,704.78.

White's method of establishing a constructive average base period net income makes it totally unacceptable. Its shortcomings are readily apparent. White had 114 machines on December 31, 1939, with a capacity of producing 4 special cut gears daily, making a maximum daily capacity of 456 gears. Using an average sales price of $14 each for the gears, he arrives at daily sales of $6,384, and on the basis of 300 days computes an annual net sales figure of $1,915,200, and regards this as the volume of net sales that would have been attained by December 31, 1939, by American's predecessor if the change in the character of its business had occurred 2 years earlier. This computation is completely unrealistic. One indication of this appears from the experience of American's predecessor after the base period. It is true that we cannot consider experience after the base period under these relief sections, but for the sole purpose of gauging the reality of the computations presented to us, we consider it significant that even after 2 years of *actual* experience subsequent to the base period and subsequent to the various changes in the business, American's predecessor managed to make in 1941 net sales of only $775,000, which was accomplished with the aid of the defense effort and with the help of 4 cus-

tomers who alone accounted for one-fourth of the total sales for that year in the last 3 months. Another weakness in this computation of net sales is White's unwarranted assumption that he would be operating at maximum capacity throughout the base period. To establish what would be a fair and just amount representing *normal* earnings to be used as a constructive average base period net income it is essential to remain within the economic and business framework of the base period. There is no evidence in the record from which we can determine that there was sufficient demand in the special gear industry, which was highly competitive, to absorb the maximum capacity of White's business operating with 114 machines during the base period.

Equally arbitrary is White's last step in the computation of a constructive average base period net income. After he determines the reconstructed net sales figures for the base period, ranging from $1,989,893 in 1936 to $1,915,200 in 1939, he takes 20.11 per cent of such figures to arrive at a constructive average base period net income of $393,042. This figure, 20.11 per cent, represents the actual per cent of net profit to net sales experienced by White in his operations for the year 1941, 2 years after the close of the base period. Here again, as in the reconstruction of net sales, White makes no effort to reconstruct his operations in the light of conditions as they existed during the base period. During the base period, White's percentages of operating profit to net sales were 15.86 per cent in 1936, 12.09 per cent in 1937, 9.27 per cent in 1938, and 7.77 per cent in 1939. During the same period his sales of special gears grew steadily from $4,900 in 1936 to $77,500 in 1939, while his sales of stock gears went from $59,600 in 1936 to $92,800 in 1937 and then fell to $75,800 in 1939. Thus, from the evidence before us, we cannot say that White's net earnings from the sale of special gears, with 2 years of added experience under normal conditions, would reach a point where they would be 20.11 per cent of net sales. In fact, the percentage of net profit to sales seemed to decrease as sales increased, and it is quite possible that White's increases in sales of special gears during the base period were at the expense of profits in order to obtain business in the highly competitive field.

White's computation of constructive net earnings has been based upon post-1939 conditions, and therefore is contrary to the requirements of the statute. Congress made its intent clear on this point:

In order to eliminate consideration of the effects of the war, it is provided that, in determining the constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer * * * after December 31, 1939. Thus high war prices, swollen demand, and other factors which would not be normal prior to the imposition of the excess profits tax shall be eliminated in the computation of the normal or average earnings capacity of the taxpayer * * *. [S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C. B. 504, 649.]

We hold that White has failed to establish a fair and just amount to be used as a constructive average base period net income that would result in an excess profits credit for the period April 7 to December 31, 1942, greater than the excess profits credit computed under the invested capital method to which White is already entitled. White, as American's transferee, is not entitled to relief under section 722.

Reviewed by the Special Division as to application of section 721 and section 722 (b) (4).

*Decision will be entered for the respondent.*