BIGELOW-SANFORD CARPET COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58093.   Filed May 20, 1960.

*Clifford L. Porter, Esq.*, for the petitioner.
*Arthur N. Mindling, Esq.*, for the respondent.

TRAIN, *Judge:* The petitioner claimed refunds of excess profits tax under section 722 [1] as follows:

---

[1] All references to sections are to the Internal Revenue Code of 1939.

| Year | Amount |
|------|--------|
| 1940 | $61,118.48 |
| 1941 | 921,026.21 |
| 1942 | 1,180,518.72 |

Respondent allowed an overassessment in the amount of $16,880.86 for the year 1942 and denied the remainder of the relief claimed.

The issue is whether petitioner's business was depressed in the base period within the meaning of section 722(b)(3)(A) by reason of conditions generally prevailing in the industry of which petitioner was a member, subjecting it to a profit cycle differing materially in length and amplitude from the general business cycle, so that its average base period net income was an inadequate standard of normal earnings. Petitioner has abandoned its claim for relief under section 722(b)(1) and (b)(2).

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

Petitioner, Bigelow-Sanford Carpet Company, Inc., hereinafter referred to as Bigelow-Sanford, is a corporation organized and existing under the laws of the State of Delaware, with its principal office located at 140 Madison Avenue, New York 16, New York. Petitioner on June 20, 1951, succeeded by statutory consolidation to Bigelow-Sanford Carpet Co., Inc., a corporation organized under the laws of the Commonwealth of Massachusetts. This proceeding is brought by and in the name of the Delaware corporation. With respect to events occurring prior to June 20, 1951, the term "petitioner" refers to the Massachusetts corporation.

Petitioner maintains its books and records on the accrual, calendar year basis, and filed its returns for the taxable years here involved on the same basis with the collector of internal revenue for the third district of New York. Petitioner's excess profits tax liability for 1940 has been finally settled in a separate proceeding before the Court of Claims, as a result of which petitioner is not entitled to recover any overpayment of excess profits tax for 1940 determined under the provisions of section 722. As finally determined, petitioner had no liability for excess profits tax for 1943, 1944, or 1945.

Petitioner timely filed applications for excess profits tax relief under section 722, Forms 991, with respect to the calendar years 1940 to 1942, inclusive, together with supporting statements and supplemental claims, claiming refund of all excess profits tax paid for such years. The excess profits taxes for 1941 and 1942 assessed against petitioner and paid by it, after adjustment for deficiencies, overassessments, and postwar refunds, were $921,026.21 and $1,163,-637.86, respectively. Petitioner duly claimed the carryover and

carryback to 1941 and 1942 of unused excess profits credits from each of the years 1940, 1943, and 1944.

The following schedule shows petitioner's excess profits net income as determined under the invested capital credit method and under the income credit method for the years 1940 to 1944:

| Year | Excess profits net income on invested capital credit method | Excess profits net income on income credit method |
|---|---|---|
| 1940 | [1] $3,124,065.17 | [1] $3,113,342.24 |
| 1941 | 5,452,367.60 | 5,440,919.61 |
| 1942 | 3,404,385.20 | 3,399,948.74 |
| 1943 | 246,024.80 | 215,108.13 |
| 1944 | 1,690,264.16 | 1,690,264.16 |

[1] As determined under 1941 law.

Petitioner's excess profits credit based on invested capital for the years 1940 to 1944, after all adjustments made as a result of audit by the Internal Revenue Service, was as follows:

| | |
|---|---|
| 1940 | $2,270,209.25 |
| 1941 | 2,104,205.73 |
| 1942 | 1,956,254.75 |
| 1943 | 1,959,904.02 |
| 1944 | 1,710,911.02 |

Petitioner's excess profits net income (or loss) during its base period, 1936 to 1939, inclusive, hereinafter referred to as the base period, computed for purposes of determining its excess profits tax for the years 1941 to 1944, after all adjustments made as a result of audit by the Internal Revenue Service, was as follows:

| | |
|---|---|
| 1936 | $2,327,347.33 |
| 1937 | 786,481.91 |
| 1938 | (1,413,847.84) |
| 1939 | 2,743,771.79 |

The arithmetic average of petitioner's base period net income was $1,110,938.30. Petitioner's average base period net income for the years 1941 to 1944 as computed under the so-called 75 per cent rule set forth in section 713(e) was $1,830,500.32. Petitioner's average base period net income for the year 1941 as computed under the so-called deficit rule set forth in section 713(e), prior to the amendment thereof by section 215 of the Revenue Act of 1942, was $1,464,400.26.

Petitioner was organized in 1914 as Bigelow Carpet Corporation. In that year it took over the business of Bigelow Carpet Company and Hartford Carpet Corporation and changed its name to Bigelow-Hartford Carpet Company. In 1929 petitioner acquired the prin-

cipal assets, organization, and going business of Stephen Sanford and Sons, Inc., of Amsterdam, New York. Data attributed herein to petitioner includes, for the period prior to such acquisition in 1929, data relating to Stephen Sanford and Sons, Inc.

Throughout the periods herein referred to, petitioner was a leading member of the Woven Wool Rug and Carpet Industry, hereinafter referred to as the carpet industry. Following the sale in February of 1920 of a mill located at Lowell, Massachusetts, which had not been used for the manufacture of carpets and rugs for some time prior thereto, petitioner's mills were located at Clinton, Massachusetts, and Thompsonville, Connecticut. After the above-mentioned acquisition of the Sanford mills at Amsterdam in 1929, petitioner continued operating the mills at Clinton and Thompsonville along with the Amsterdam mills up until March of 1933 when the Clinton plant was closed down. Petitioner's mill operations were thereafter confined to Thompsonville and Amsterdam throughout all of the subsequent years material to the present case.

The operations and the products of the members of the carpet industry were substantially similar. All were subject to the same major economic circumstances affecting their operations. The principal raw material used was wool. During the period 1922 to 1939, wool comprised practically 100 per cent of all of the surface fiber used in carpets and rugs. Throughout this period, wool was either the largest or next to the largest element in the cost of production. The wool used was of a coarse type and substantially all of it was imported. The principal sources of supply were British India, China, United Kingdom, Turkey, New Zealand, Argentina, and Syria. The prices of carpet wools showed wide fluctuations and were noted for their instability. Exposure to this risk, however, was a common feature and normal characteristic of the carpet industry.

The carpet industry was characterized by a long production cycle when compared with other industries, which production cycle was attributable in part to the distance from the source of supply of wool and the length of time required to process material. The normal cycle, beginning with the time a company committed itself for the wool and ending with the time the finished carpets were sold and accounts were collected, was approximately 1 year.

The looms used by the industry were expensive machines and required large capital investment and subjected the industry to high overhead cost. Sales for the industry in relation to invested capital were low compared with many other industries.

The Excess Profits Tax Council assembled data as to 14 members of the carpet industry in a study by one of its economic advisors, Glen R. Treanor, entitled "The Woven Wool Rug and Carpet Industry," herein referred to as the Carpet Industry Study, which was circulated in 1951 to members of the industry who had filed claims under section 722. These data were assembled from Federal income tax returns filed by members of the woven wool rug and carpet industry and the 14 corporations for which the data were developed represent all the industry members for which corresponding data could be obtained from such source for the period from 1917 to 1940, inclusive.

The following schedule shows the total value of all wool rugs and carpets produced in the United States as compiled by the Bureau of the Census for the census years 1919 to 1939, inclusive, in a parallel column with (a) the total net sales of the above-mentioned 14 members of the carpet industry as compiled from their Federal income tax returns for the years 1919 to 1939, inclusive; and (b) a 1922–1939 index for such total net sales data:

| Year | Total value of U.S. carpet production in census years | Net sales of 14 members of carpet industry | |
| | | As stated in dollars | As stated in terms of 1922–39 index |
|---|---|---|---|
| | *Thousands* | *Thousands* | |
| 1919 | $109,605 | $85,231 | 88.01 |
| 1920 | | 118,277 | 122.14 |
| 1921 | 99,628 | 82,014 | 84.69 |
| 1922 | | 124,411 | 128.47 |
| 1923 | 192,078 | 136,363 | 140.82 |
| 1924 | | 112,261 | 115.93 |
| 1925 | 181,864 | 125,727 | 129.83 |
| 1926 | | 123,433 | 127.46 |
| 1927 | 165,263 | 118,072 | 121.93 |
| 1928 | | 111,404 | 115.04 |
| 1929 | 175,285 | [1] 124,130 | [1] 128.18 |
| 1930 | | 77,122 | 79.64 |
| 1931 | 86,942 | 62,291 | 64.33 |
| 1932 | | 39,159 | 40.44 |
| 1933 | 69,180 | 51,099 | 52.77 |
| 1934 | | 55,342 | 57.15 |
| 1935 | 107,576 | 77,182 | 79.70 |
| 1936 | | 103,766 | 107.15 |
| 1937 | 148,306 | 112,257 | 115.92 |
| 1938 | | 80,084 | 82.70 |
| 1939 | 152,398 | 108,972 | 112.53 |
| Averages of census years: | *Index* | | |
| 1922–1939 | 142,099 | 100.0 | 96,838 | 100.00 |
| 1936–1939 | 150,352 | 105.8 | 101,270 | 104.58 |

[1] In the case of the data herein shown for the 14 industry members, net sales for 1929 include $2,552,168 out of a total of $6,835,000 which was reported by Stephen Sanford and Sons, Inc., as the amount received for the transfer of its inventory in bulk to the petitioner.

The following table shows for the years 1917 to 1939 the net profit (or loss) less tax-exempt income of petitioner and of the 14 carpet companies on an aggregate basis together with corresponding data expressed as a series of index numbers based upon the average for

1922 to 1939 as 100. Such an index is hereinafter referred to as a 1922–1939 index. The table also shows for the years 1918 to 1939, 1922–1939 indexes of compiled net profit (or loss) less tax-exempt income of all corporations filing returns, as shown in Mim. 5807, 1945 C.B. 273.

| Year | Petitioner | | 14 companies [1] | | All corporations |
| | Amount | 1922–39 index | Amount | 1922–39 index | 1922–39 index |
| --- | --- | --- | --- | --- | --- |
| 1917 | $2, 439, 959 | 110. 4 | $7, 758, 432 | 121. 9 | |
| 1918 | 3, 069, 160 | 138. 8 | 8, 690, 208 | 136. 5 | 223. 4 |
| 1919 | 5, 508, 034 | 249. 2 | 16, 154, 542 | 253. 8 | 245. 1 |
| 1920 | 3, 995, 765 | 180. 8 | 21, 078, 636 | 331. 2 | 171. 0 |
| 1921 | 4, 058, 480 | 183. 6 | 14, 120, 248 | 221. 8 | 13. 3 |
| 1922 | 9, 439, 781 | 426. 9 | 30, 501, 126 | 479. 2 | 138. 9 |
| 1923 | 9, 986, 966 | 451. 8 | 30, 173, 493 | 474. 0 | 183. 7 |
| 1924 | 2, 817, 481 | 127. 4 | 12, 288, 456 | 193. 1 | 156. 2 |
| 1925 | 4, 487, 004 | 202. 9 | 13, 711, 342 | 215. 4 | 221. 9 |
| 1926 | 2, 460, 400 | 111. 3 | 8, 625, 916 | 135. 5 | 218. 5 |
| 1927 | 2, 791, 509 | 126. 3 | 11, 262, 953 | 176. 9 | 189. 6 |
| 1928 | 3, 864, 475 | 174. 8 | 8, 124, 698 | 127. 6 | 239. 6 |
| 1929 | 2, 103, 764 | 95. 2 | [2] 717, 392 | 11. 3 | 254. 5 |
| 1930 | (1, 482, 851) | (67. 1) | (10, 205, 543) | (160. 3) | 45. 2 |
| 1931 | 287, 437 | 13. 0 | (2, 783, 418) | (43 7) | (95. 7) |
| 1932 | (1, 739, 909) | (78. 7) | (7, 772, 820) | (122. 1) | (164. 3) |
| 1933 | (290, 821) | (13. 2) | 1, 227, 059 | 19. 3 | (74. 2) |
| 1934 | 228, 226 | 10. 3 | (268, 345) | (4. 2) | 2. 7 |
| 1935 | 630, 205 | 28. 5 | 2, 571, 245 | 40. 4 | 49. 4 |
| 1936 | 2, 130, 740 | 96. 4 | 5, 756, 918 | 90. 4 | 127. 3 |
| 1937 | 747, 942 | 33. 8 | 2, 936, 959 | 46. 1 | 128. 3 |
| 1938 | ($1, 415, 543) | (64. 0) | ($4, 801, 061) | (75. 4) | 46. 8 |
| 1939 | 2, 747, 116 | 124. 3 | 12, 508, 517 | 196. 5 | 131. 3 |
| Averages: | | | | | |
| 1922–1939 | 2, 210, 662 | 100. 0 | [2] 6, 365, 271 | 100. 00 | 100. 0 |
| 1936–1939 | 1, 052, 564 | 47. 6 | 4, 100, 333 | 64. 42 | 108. 4 |

[1] The 14 companies are Beattie Manufacturing Co., Bigelow-Sanford Carpet Co., Inc., Charles P. Cochrane Co., Firth Carpet Co., Hardwick & Magee Co., Hightstown Rug Co., Archibald Holmes & Son, Inc., Magee Carpet Co., C. H. Masland & Sons, Inc., Mohawk Carpet Mills, Inc., Philadelphia Carpet Co., Roxbury Carpet Co., Alexander Smith & Sons Carpet Company, and M. J. Whittall Associates, Ltd.

[2] The total amount herein shown for the year 1929 as well as for the 18-year average reflects the inclusion of a loss in the amount of $3,149,580.80 which was reported by Stephen Sanford and Sons, Inc., upon the transfer of its assets to the petitioner.

General business conditions have always exerted a major influence on the sales and profits of the carpet industry. The demand for carpets stems from the very heart of the business cycle and in the absence of secular, erratic, random, or abnormal factors, which would include substantial changes in the character or activities of individual members, the sales and profits of all industry members tend to rise and fall with general business.

In terms of total sales volume the most important competitors of the petitioner during the period from 1922 through 1939 were two firms then known as Alexander Smith & Sons Carpet Company and Mohawk Carpet Mills, Inc., which are sometimes hereinafter referred to as Smith and Mohawk, respectively.

The following schedule covers the years 1922 to 1939, inclusive, and shows the annual net sales of Smith and Mohawk, respectively; the petitioner's annual net sales; and the aggregate annual net sales

of the four largest members of the carpet industry, as reported on their Federal income tax returns:

| Year | Net sales of Smith | Net sales of Mohawk [1] | Net sales of petitioner | Net sales of 4 largest members of industry [2] |
|---|---|---|---|---|
| | | | *In thousands* | |
| 1922 | $27,944 | $17,288 | $37,398 | $92,502 |
| 1923 | 26,259 | 19,995 | 42,287 | 99,128 |
| 1924 | 24,537 | 14,654 | 31,558 | 79,463 |
| 1925 | 26,841 | 18,799 | 34,566 | 89,727 |
| 1926 | 26,771 | 18,500 | 35,193 | 88,676 |
| 1927 | 26,807 | 18,617 | 31,450 | 84,676 |
| 1928 | 17,658 | 18,507 | 35,096 | 78,096 |
| 1929 | 21,582 | 23,124 | [3] 37,990 | [3] 90,751 |
| 1930 | 12,164 | 12,656 | 23,342 | 53,974 |
| 1931 | 9,393 | 11,299 | 17,842 | 42,271 |
| 1932 | 6,126 | 6,805 | 10,738 | 25,330 |
| 1933 | 8,563 | 8,363 | 13,071 | 32,316 |
| 1934 | 7,770 | 9,194 | 15,111 | 35,442 |
| 1935 | 12,574 | 13,389 | 20,469 | 50,519 |
| 1936 | 17,139 | 16,855 | 28,217 | 67,423 |
| 1937 | 18,824 | 17,357 | 30,545 | 72,662 |
| 1938 | 13,997 | 11,523 | 21,383 | 51,189 |
| 1939 | 21,004 | 16,691 | 26,110 | 67,582 |
| Averages: | | | | |
| 1922–1939 | 18,108 | 15,201 | 27,354 | 66,763 |
| 1924–1939 | 16,984 | 14,771 | 25,793 | 63,131 |
| 1936–1939 | 17,741 | 15,606 | 26,566 | 64,714 |

[1] Gross sales less returns, allowances, trade rebates, and cash discounts.
[2] The four largest members of the industry include Smith, Mohawk, and petitioner.
[3] In the case of the 4 companies, net sales for 1929 include $2,552,168 out of a total of $6,835,000 which was reported by Stephen Sanford and Sons, Inc., as the amount received for the transfer of its inventory in bulk to petitioner. The 1929 net sales herein shown for petitioner exclude the entire $6,835,000.

The dollar amounts shown in the last two columns of the preceding schedule expressed in terms of a 1922–1939 index are as follows:

| Year | Net sales of petitioner | Net sales of 4 largest members of industry | Year | Net sales of petitioner | Net sales of 4 largest members of industry |
|---|---|---|---|---|---|
| 1922 | 136.7 | 138.6 | 1933 | 47.8 | 48.4 |
| 1923 | 154.6 | 148.5 | 1934 | 55.2 | 53.1 |
| 1924 | 115.4 | 119.0 | 1935 | 74.8 | 75.7 |
| 1925 | 126.4 | 134.4 | 1936 | 103.2 | 100.9 |
| 1926 | 128.7 | 132.8 | 1937 | 111.7 | 108.8 |
| 1927 | 114.9 | 126.8 | 1938 | 78.2 | 76.7 |
| 1928 | 128.3 | 116.9 | 1939 | 95.5 | 101.2 |
| 1929 | 138.9 | 135.9 | Averages: | | |
| 1930 | 85.3 | 80.8 | 1922–1939 | 100.0 | 100.0 |
| 1931 | 65.2 | 63.3 | 1924–1939 | 94.3 | 94.6 |
| 1932 | 39.3 | 37.9 | 1936–1939 | 97.1 | 96.9 |

Although the average annual sales of the 14 carpet companies during the base period was 104.6 per cent of those during the extended period of 18 years from 1922 to 1939, the ratio of profits to sales during the base period was only 4.1 per cent compared with 6.6 per cent during the 18-year period. Petitioner's average annual sales during the base period were 96.6 per cent of its sales in the extended period 1922 to 1939, and its ratio of profits to sales was 4 per cent for the base period as against 7 per cent for the extended period 1922 to 1939.

The market for rugs and carpets stemmed from "replacement demand" and "new demand." A portion of the new demand was attributable to new residential construction. The replacement market accounted for a high percentage of carpet industry sales. The replacement market, however, was to a large degree affected by the ability of people to move. New residential construction therefore provided stimulus to the replacement market as well as creating new demand.

The following schedule covers the years 1921 to 1939, inclusive, and sets forth (a) petitioner's total production of rugs and carpets in terms of square yards; (b) a 1922–1939 index of such production for petitioner; (c) the total square yards of all carpet production in the United States as compiled by the Bureau of the Census for odd-numbered years and as estimated for even-numbered years on the basis of data compiled by the United States Department of Agriculture with respect to total mill consumption of carpet wools; (d) a 1922–1939 index of such total production in the United States; and (e) the Federal Reserve Index of Industrial Production as determined on the basis of using the 1922–1939 average as 100:

| Year | Petitioner's total production | | Total production in the United States | | Federal Reserve Index of Industrial Production |
|---|---|---|---|---|---|
| | In square yards | On basis of 1922–39 index | In square yards | On basis of 1922–39 index | |
| | *Thousands* | | *Millions* | | |
| 1921 | 9,937 | 95.5 | 52.6 | 90.4 | 65 |
| 1922 | 14,979 | 144.0 | 72.3 | 124.2 | 82 |
| 1923 | 15,335 | 147.4 | 83.5 | 143.5 | 99 |
| 1924 | 11,694 | 112.4 | 68.9 | 118.4 | 92 |
| 1925 | 11,566 | 111.2 | 72.2 | 124.1 | 101 |
| 1926 | 11,760 | 113.1 | 63.4 | 108.9 | 108 |
| 1927 | 11,809 | 113.5 | 67.2 | 115.5 | 107 |
| 1928 | 12,024 | 115.6 | 67.6 | 116.2 | 111 |
| 1929 | 14,505 | 139.5 | 73.4 | 126.1 | 124 |
| 1930 | 7,971 | 76.6 | 38.2 | 65.6 | 102 |
| 1931 | 8,151 | 78.4 | 44.2 | 75.9 | 84 |
| 1932 | 4,894 | 47.1 | 24.7 | 42.4 | 65 |
| 1933 | 7,297 | 70.2 | 41.9 | 72.0 | 78 |
| 1934 | 7,672 | 73.8 | 37.1 | 63.7 | 84 |
| 1935 [1] | 9,369 | 90.1 | 59.9 | 102.9 | 98 |
| 1936 [1] | 10,742 | 103.3 | 64.3 | 110.5 | 116 |
| 1937 [1] | 10,434 | 100.3 | 64.8 | 111.3 | 127 |
| 1938 [1] | 7,077 | 68.0 | 39.6 | 68.0 | 100 |
| 1939 [1] | 9,947 | 95.6 | 63.7 | 109.5 | 122 |
| Averages: | | | | | |
| 1922–1939 | 10,401 | 100.0 | 58.2 | 100.0 | 100 |
| 1924–1939 | 9,807 | 94.3 | 55.7 | 95.7 | 101 |
| 1936–1939 | 9,550 | 91.8 | 58.1 | 99.8 | 117 |

[1] Exclusive of felt rug production which was as follows:

| Year | Square yards produced |
|---|---|
| 1935 | 1,685,706 |
| 1936 | 2,574,990 |
| 1937 | 1,004,043 |
| 1938 | 1,738,905 |
| 1939 | 2,353,413 |

Imports and mill consumption of carpet wools for the period 1921 through 1939 were as follows:

| Year | Carpet wool imports less reexports | | Mill consumption of carpet wools | | | |
|---|---|---|---|---|---|---|
| | | | Quantity (1,000,000 lbs.) | | Indexes, 1922–39=100 | |
| | Quantity (greasy basis) | Indexes, 1922–39 =100 | Scoured basis | Greasy basis | Scoured basis | Greasy basis |
| | *(1,000 lbs.)* | | | | | |
| 1921 | 97,820 | 76.5 | 43.7 | 60.7 | 49.6 | 49.3 |
| 1922 | 172,828 | 135.1 | 93.7 | 130.1 | 106.4 | 105.7 |
| 1923 | 121,518 | 95.0 | 111.1 | 152.2 | 126.1 | 123.6 |
| 1924 | 140,684 | 110.0 | 92.5 | 126.7 | 105.0 | 102.9 |
| 1925 | 157,579 | 123.2 | 98.2 | 134.5 | 111.5 | 109.3 |
| 1926 | 115,235 | 90.1 | 88.0 | 120.5 | 99.9 | 97.9 |
| 1927 | 143,872 | 112.5 | 95.4 | 130.7 | 108.3 | 106.2 |
| 1928 | 148,794 | 116.3 | 100.8 | 138.1 | 114.4 | 112.2 |
| 1929 | 174,483 | 136.4 | 114.9 | 157.4 | 130.4 | 127.9 |
| 1930 | 90,622 | 70.8 | 62.5 | 85.6 | 70.9 | 69.5 |
| 1931 | 113,796 | 88.9 | 73.3 | 103.2 | 83.2 | 83.4 |
| 1932 | 39,196 | 30.6 | 41.6 | 58.6 | 47.2 | 47.6 |
| 1933 | 114,468 | 89.5 | 71.6 | 100.8 | 81.3 | 81.9 |
| 1934 | 79,037 | 61.8 | 62.1 | 88.7 | 70.5 | 72.1 |
| 1935 | 159,907 | 125.0 | 98.5 | 141.7 | 111.8 | 115.1 |
| 1936 | 142,562 | 111.5 | 106.3 | 152.5 | 120.7 | 123.9 |
| 1937 | 171,636 | 134.2 | 106.6 | 152.7 | 121.0 | 124.0 |
| 1938 | 71,851 | 56.2 | 64.9 | 93.0 | 73.7 | 75.6 |
| 1939 | 144,633 | 113.1 | 103.4 | 149.2 | 117.4 | 121.2 |
| Averages: | | | | | | |
| 1936–1939 | 132,603 | 103.7 | 95.3 | 136.9 | 108.2 | 111.2 |
| 1922–1939 | 127,913 | 100.0 | 88.1 | 123.1 | 100.0 | 100.0 |

The following schedule covers the years 1921 to 1939, inclusive, and sets forth (a) the total expenditures for non-farm residential construction, as compiled by the United States Department of Commerce and Labor, (b) the total number of non-farm family dwelling units started, as compiled by the Office of Housing Economics, and (c) the average number of square yards of wool rugs and carpets produced for each of such dwelling units started, as determined on the basis of the total carpet production data set forth above:

| Year | Expenditures for non-farm residential construction | Indexes | Number of non-farm dwelling units started | Indexes | Square yards of carpet production per dwelling unit started |
|---|---|---|---|---|---|
| | *Millions* | | *Thousands* | | |
| 1921 | $1,795 | 89.3 | 449 | 72.7 | 117.1 |
| 1922 | 2,955 | 142.3 | 716 | 119.7 | 101.0 |
| 1923 | 3,960 | 173.2 | 871 | 160.5 | 95.9 |
| 1924 | 4,575 | 177.5 | 893 | 185.4 | 77.2 |
| 1925 | 4,910 | 186.3 | 937 | 198.9 | 77.0 |
| 1926 | 4,920 | 168.8 | 849 | 199.4 | 74.7 |
| 1927 | 4,540 | 161.0 | 810 | 184.0 | 83.0 |
| 1928 | 4,195 | 149.7 | 753 | 170.0 | 89.8 |
| 1929 | 3,040 | 101.2 | 509 | 123.2 | 144.0 |
| 1930 | 1,570 | 65.6 | 330 | 63.6 | 115.8 |
| 1931 | 1,320 | 50.5 | 254 | 53.5 | 174.0 |
| 1932 | 485 | 26.6 | 134 | 19.7 | 184.3 |
| 1933 | 290 | 18.5 | 93 | 11.8 | 450.5 |
| 1934 | 380 | 25.0 | 126 | 15.4 | 204.4 |
| 1935 | 710 | 42.9 | 216 | 28.8 | 277.3 |
| 1936 | 1,210 | 62.8 | 316 | 49.0 | 203.5 |
| 1937 | 1,475 | 66.4 | 334 | 59.8 | 194.0 |
| 1938 | 1,620 | 81.1 | 408 | 65.6 | 97.1 |
| 1939 | 2,270 | 101.0 | 508 | 92.0 | 125.4 |
| Averages: | | | | | |
| 1922–1939 | 2,468 | 100.0 | 503 | 100.0 | 113.5 |
| 1924–1939 | 2,344 | -------- | 467 | -------- | 166.4 |
| 1936–1939 | 1,644 | 77.7 | 391 | 66.6 | 148.8 |

Because the carpet industry was characterized by very heavy capital investment and very heavy overhead in relation to volume of sales, changes in volume had a very marked effect on carpet profits. The real stimulus to the carpet business in the early 1920's, which brought high loom activity and high profits, was the building boom during that period. Conversely, the slump in residential building activity witnessed in the early 1930's had adverse effects on the sales of the carpet industry.

A survey of the furniture and floor-covering industries issued on September 22, 1939, near the close of the base period, in Poor's "Industry and Investment Surveys," contained the following paragraph:

RESIDENTIAL CONSTRUCTION                                    STIMULATING

New demand for home furnishings arises largely from residential construction, marriages, and the "undoubling" of families accompanying business recovery. Of the three factors, the construction of homes accounts for the major portion of new demand. Consequently, the slump in residential building activity witnessed in the early 1930s had considerably adverse effects on the sales of home furnishings.

The survey charted the following indexes of activity of the carpet industry, residential construction, and general industrial production, based on 1925 as equal to 100:

| | Woolen carpet and rug machine activity | Residential building activity | Industrial production | | Woolen carpet and rug machine activity | Residential building activity | Industrial production |
|---|---|---|---|---|---|---|---|
| 1925 | 100 | 100 | 100 | 1933 | 42 | 13 | 73 |
| 1926 | 90 | 93 | 104 | 1934 | 39 | 12 | 76 |
| 1927 | 89 | 88 | 102 | 1935 | 52 | 24 | 87 |
| 1928 | 89 | 102 | 107 | 1936 | 54 | 40 | 101 |
| 1929 | 92 | 69 | 114 | 1937 | 57 | 42 | 106 |
| 1930 | 53 | 41 | 92 | 1938 | 36 | 43 | 83 |
| 1931 | 48 | 34 | 78 | 1939 [1] | 50 | 57 | 94 |
| 1932 | 32 | 13 | 62 | | | | |

[1] 7 months.

The influence of residential construction activity on sales and earnings of the carpet industry was made the basis of forward planning by petitioner's management.

Rugs and carpets are classified as semiluxury products and as consumer durables. Purchases for replacement are easily deferrable. Accordingly, the sales and profits of the carpet industry are highly sensitive to changes in consumer purchasing power. The fact that purchases are easily postponable in depression periods results in

wider fluctuations in carpet industry sales and earning power in the course of the business cycle than those which occur with respect to consumer goods industries generally. Conversely, replacement needs which accumulate during depression times accentuate sales gains in periods of recovery.

In January 1950 the United States Department of Commerce published a study of the responses of various categories of consumption expenditures to fluctuations in disposable personal income during the years 1929 to 1940. Consumption expenditures were divided into 131 groups, of which 22 were classified as durable goods, 22 as non-durable goods, and 87 as services. The group entitled "Floor coverings" was classified among durable goods.

For the purposes of this study, it was determined that the total consumption expenditures on all goods and services had a sensitivity coefficient to changes in disposable personal income during the period of 0.86. That is to say, other things being equal, a change of 10 per cent in disposable personal income during the period was associated on the average with a change of 8.6 per cent in total consumption expenditures. The 131 groups were divided into 3 categories according to sensitivity. Of these, 43 were considered of average sensitivity (coefficient between 0.7 and 1), 49 as of above-average sensitivity (coefficient above 1), and 39 as of below-average sensitivity.

The study disclosed that the durable goods groups tended to have a high income-sensitivity, 20 out of the 22 such groups being classified in the above-average sensitivity category. The floor-covering group had a sensitivity coefficient of 1.4. Of the 131 groups 4 others had the same coefficient, 16 had a higher coefficient, and 111 had a lower coefficient.

Although the disposable personal income series was not published by the United States Department of Commerce prior to 1929, the Dewhurst series, a privately published series reporting biennial census years prior to 1929 and annual data thereafter, has compiled total consumption expenditures and consumption expenditures by product groups, including floor coverings. The following table, prepared from the Dewhurst series, shows total consumption expenditures and floor-covering consumption expenditures for biennial census years from 1921 to 1929 and annually thereafter to 1939, together with related indexes based on the average of odd-numbered years from 1921 to 1939 as 100 (the even-numbered years reported during the latter part of the series are omitted in computing the index to avoid the distortion which would otherwise result) :

| Year | Consumption expenditures (Dewhurst) | | | |
| --- | --- | --- | --- | --- |
| | Total | | Floor coverings | |
| | Amount (in millions) | 1921–39 index (odd years only) | Amount (in millions) | 1921–39 index (odd years only) |
| 1921 | $56,007.0 | 86.6 | $331.0 | 82.2 |
| 1922 | | | | |
| 1923 | 66,827.0 | 103.4 | 542.0 | 134.6 |
| 1924 | | | | |
| 1925 | 70,890.0 | 109.9 | 576.0 | 143.0 |
| 1926 | | | | |
| 1927 | 74,499.0 | 115.3 | 533.0 | 132.3 |
| 1928 | | | | |
| 1929 | 80,329.6 | 124.3 | 499.5 | 124.0 |
| 1930 | 72,597.5 | 112.3 | 347.9 | 86.4 |
| 1931 | 62,650.9 | 96.9 | 319.9 | 79.4 |
| 1932 | 50,535.4 | 78.2 | 224.1 | 55.6 |
| 1933 | 46,507.5 | 71.9 | 189.4 | 47.0 |
| 1934 | 51,907.2 | 80.3 | 275.6 | 68.4 |
| 1935 | 56,351.4 | 87.5 | 307.1 | 76.2 |
| 1936 | 62,164.8 | 96.2 | 338.7 | 84.1 |
| 1937 | 66,055.8 | 102.2 | 370.7 | 92.0 |
| 1938 | 63,133.8 | 97.7 | 323.5 | 80.3 |
| 1939 | 66,286.6 | 102.5 | 359.5 | 89.3 |
| Averages: | | | | |
| All years | 63,049.0 | | 369.2 | |
| Odd years | 64,640.5 | 100.0 | 402.8 | 100.0 |
| 1936–1939 | 64,410.0 | 99.6 | 348.1 | 86.4 |

The sensitivity of consumers' expenditures for rugs and carpets to changes in disposable personal income, of the character described in the Department of Commerce study, intimately affected the sales and profits of the carpet industry. This sensitivity affected the distance and speed with which carpet sales increased and decreased, showing that the carpet industry experienced a greater degree of fluctuation, measured by the vertical distance between high and low stages, than did general business. The increase in total consumption expenditures from $63 billion in 1938 to $66 billion in 1939 produced a much greater relative increase in the profits of carpet companies than for business generally.

The profits of members of the carpet industry were adversely affected to a very substantial extent over the course of the 18-year period from 1922 to 1939, inclusive, by increasing competition from other types of consumer goods, such as automobiles, radios, washing machines, and refrigerators. The increase in popularity of these other types of consumer goods meant that a smaller proportion of total personal consumption expenditures was available for use in the purchase of wool floor coverings.

There was a carryover of pent-up demand for carpeting during the early 1920's which resulted from a curtailed level of production during World War I and the first few years immediately thereafter. The carpet-manufacturing industry was classified as nonessential during the war, supplies of raw wool were made irregular by restricted shipping facilities, and most carpet producers experienced difficulty over an extended period in maintaining an adequate labor force for production as well as for the maintenance and rehabilita-

tion of their machinery and equipment after the cessation of hostilities. The industry also suffered from a series of strikes during 1921 which held down its production and sales during a major portion of that year. The buoyant influence of the unsatisfied demand which thereafter began to be supplied not only carried petitioner's sales and profits to unusually high levels in 1922 and 1923 but also persisted, with diminishing importance, until about 1925.

The profits of the members of the carpet industry received a temporary stimulus in 1931 as a result of a sharp increase in the import duty on wool rugs and carpets from 40 per cent to 60 per cent ad valorem. At about this same time there was also a very marked increase in technical productive efficiency which is evident from a comparison of the industry averages for output per loom hour from year to year. The average output per loom hour in 1930 was 3.71 square yards and the corresponding production per loom hour in 1931 was 4.72 square yards.

WOOL RUG AND CARPET INDUSTRY: WEEKLY AVERAGES OF LOOM HOURS AND CARPET WOOL CONSUMPTION, 1921–1941

| Year | Loom hours [1] | | Carpet wool consumption [2] (scoured basis) | |
|---|---|---|---|---|
| | Hours | Indexes 1922–39 =100 (per cents) | Pounds | Indexes 1922–39 =100 (per cents) |
| | *Thousands* | | *Thousands* | |
| 1921 | 243 | 96.0 | 839 | 49.7 |
| 1922 | 374 | 147.8 | 1,802 | 106.7 |
| 1923 | 409 | 161.7 | 2,129 | 126.1 |
| 1924 | 329 | 130.0 | 1,767 | 104.6 |
| 1925 | 373 | 147.4 | 1,876 | 111.1 |
| 1926 | 335 | 132.4 | 1,686 | 99.8 |
| 1927 | 331 | 130.8 | 1,831 | 108.4 |
| 1928 | 333 | 131.6 | 1,932 | 114.4 |
| 1929 | 342 | 135.2 | 2,202 | 130.4 |
| 1930 | 198 | 78.3 | 1,198 | 70.9 |
| 1931 | 180 | 71.1 | 1,405 | 83.2 |
| 1932 | 118 | 46.6 | 796 | 47.1 |
| 1933 | 159 | 62.8 | 1,377 | 81.5 |
| 1934 | 143 | 56.5 | 1,198 | 70.9 |
| 1935 | 195 | 77.1 | 1,895 | 112.2 |
| 1936 | 202 | 79.8 | 2,044 | 121.0 |
| 1937 | 213 | 84.2 | 2,050 | 121.4 |
| 1938 | 134 | 53.0 | 1,225 | 72.5 |
| 1939 | 193 | 76.3 | 1,989 | 117.8 |
| Averages: | | | | |
| 1936–1939 | 185 | 73.1 | 1,827 | 108.2 |
| 1922–1939 | 253 | 100.0 | 1,689 | 100.0 |

[1] Source: "Survey of Current Business, 1942 Supplement," p. 168.
[2] Source: United States Department of Agriculture, Bureau of Agricultural Economics, "Wool Statistics," 1949, p. 46.

The profits of the members of the carpet industry received a temporary stimulus in 1933 through the operation of the National Recovery Administration program. The profits of the carpet industry received another temporary stimulus in September of 1939 as a result of conditions associated with the outbreak of World War II. Sources of supply were threatened at that time and stores made very substantial purchases to guard against a possible shortage of carpet wool and jute, the most important raw materials used in the manufacture of carpeting and for which the industry was dependent upon imports for supplies.

264

There were a number of carpet manufacturers, including petitioner, which adopted the so-called Lifo (last-in, first-out) method of valuing their inventories for the first time in the year 1939. There were in all about five or six companies making this change and they included Mohawk and another corporation known as Artloom Corporation which was one of petitioner's important competitors and among approximately the first six members of the industry in terms of size. In petitioner's case, the adoption of Lifo resulted in an understatement of 1939 profits with reference to earlier years by approximately $790,000.

The profits of the members of the carpet industry were adversely affected in substantial degree over the course of the 18-year period from 1922 to 1939, inclusive, by an expansion in the production of asphalted felt-base floor covering. This competitive product is a smooth-surfaced material built up on a layer of felt impregnated with asphalt which is somewhat similar to linoleum in outward appearance but clearly distinguishable therefrom. The latter is a more expensive product which has a base consisting essentially of pressed cork and linseed oil. Linoleum is commonly cemented to the floor and is extensively used in commercial buildings, kitchens, and other points of heavy wear. Asphalted felt-base floor coverings are not ordinarily cemented down and are rarely used in public or commercial buildings. These floor coverings were ordinarily produced in the form of separate rugs which came to be more and more extensively used for living rooms in homes over the years 1922 to 1939, inclusive, and were thus sold primarily in competition with wool rugs in the lower price range.

The following schedule covering the census years 1919 to 1939, inclusive, sets forth the total quantity and value of all asphalted felt-base floor covering produced in the United States as compiled by the Bureau of the Census:

| Census year | Total quantity (square yards) | Total value | Value per square yard | Census year | Total quantity (square yards) | Total value | Value per square yard |
|---|---|---|---|---|---|---|---|
| | *Thousands* | *Thousands* | | | *Thousands* | *Thousands* | |
| 1919 | 30,370 | $13,909 | $0.46 | 1931 | 87,576 | $21,629 | $0.26 |
| 1921 | 31,728 | 13,043 | .41 | 1933 | 101,275 | 22,714 | .22 |
| 1923 | 71,076 | 30,240 | .43 | 1935 | 128,043 | 31,260 | .24 |
| 1925 | 77,889 | 30,029 | .39 | 1937 | 157,077 | 36,462 | .23 |
| 1927 | 111,793 | 34,900 | .31 | 1939 | 166,567 | 37,881 | .23 |
| 1929 | 117,970 | 36,943 | .31 | | | | |

The carpet industry kept pace with its principal competition in the floor-covering market, linoleum and asphalted felt base products of the hard-surface floor-covering group. In terms of average annual square yards produced, wool rugs and carpets, although showing an increase in absolute production, declined in relative production

from 30.4 per cent of the three groups, combined, for the biennial census years 1921 to 1939, to 25.7 per cent for the base period years. In terms of average annual production by value the carpet industry percentage increased from 69.09 per cent for the biennial census years in the 1921–1939 period to 69.28 per cent for the base period census years 1937 and 1939. During the 1921–1939 period, the value per square yard of asphalted felt base products, which accounted for the entire increase in hard-surface flooring yardage, dropped from 41 cents to 23 cents.

Imports of carpet, another potential source of competition with petitioner and the carpet industry, had declined by the time of the base period. For the extended period 1922 to 1939 annual imports averaged about 2,100,000 square yards. During the base period they averaged only 1,500,000 square yards.

Although during the extended period 1922 to 1939 there was a reduction in the number of smaller carpet-manufacturing establishments, this reduction was largely due to absorption, consolidations, and merger rather than the actual elimination of production capacity. Of the larger establishments, however, those having annual production of over $1 million, there were 27 in 1919 and 26 in 1939. The number of wage earners in the carpet industry decreased, but through greater mechanization the productivity of labor increased during the extended period 1922 to 1939 in terms of both yards per man and value added by manufacturer.

The number of establishments, wage earners, wages, the cost of materials, supplies, fuel, purchased electric energy, and contract work, the value of products, and value added by manufacture for the wool rug and carpet industry for each of the census years 1909 through 1939 were as follows:

| Year | Number of establishments | Wage earners (average number per year) | Wages | Cost of materials and supplies, fuel, etc.[1] | Value of product | Value added by manufacture |
|---|---|---|---|---|---|---|
| | | | Thousands | Thousands | Thousands | Thousands |
| 1909 | 139 | 33,307 | $15,536 | $39,563 | $71,188 | $31,625 |
| 1914 | 97 | 31,309 | 14,716 | 42,280 | 69,128 | 26,848 |
| 1919 | 75 | 22,933 | 24,216 | 67,118 | 123,254 | 56,136 |
| 1921 | 72 | 22,922 | 28,705 | 50,118 | 103,881 | 53,762 |
| 1923 | 79 | 35,217 | 48,528 | 97,473 | 199,481 | 102,008 |
| 1925 | 69 | 33,886 | 43,383 | 104,196 | 187,779 | 83,583 |
| 1927 | 65 | 32,829 | 42,041 | 85,602 | 166,888 | 81,287 |
| 1929 | 67 | 32,623 | 40,014 | 86,651 | 176,915 | 90,264 |
| 1931 | 61 | 22,903 | 24,109 | 38,876 | 88,204 | 49,328 |
| 1933 | 54 | 21,296 | 18,186 | 30,032 | 71,425 | 41,393 |
| 1935 | 55 | 27,633 | 27,710 | 56,234 | 115,257 | 59,023 |
| 1937 | 54 | 30,346 | 31,702 | 80,672 | 158,778 | 78,106 |
| 1939 [2] | 43 | 25,590 | 30,144 | 61,066 | 140,338 | 79,272 |
| Averages: | | | | | | |
| 1937–1939 | 48 | 27,968 | 30,923 | 70,869 | 149,558 | 78,689 |
| 1923–1939 | 61 | 29,147 | 33,980 | 71,200 | 145,007 | 73,807 |

[1] Materials, supplies, fuel, purchased electric energy, and contract work.
[2] The decrease in number of establishments from 1937 to 1939 was due primarily to the withdrawal from business of 6 establishments and the reclassification of 4 very small establishments in other industries.

Petitioner entered into a contract with a major manufacturer of felt-base floor coverings under the terms of which it acquired a stock of hard-surfaced floor coverings of this character for the first time in July of 1936. Such stock carried a Bigelow label and petitioner thereupon attempted to merchandise the same at a profit. Relatively small quantities of this product were sold in 1936 at an average price of approximately 32 cents per square yard. The venture soon proved to be unsuccessful, however, and was completely discontinued about 18 months after being started. A total loss of $228,416 was sustained on the entire project and most of this loss fell in the year 1937 for accounting purposes.

It was a common practice in the carpet industry for the firms entering into purchase commitments for the acquisition of raw wool abroad to defer making any record of such commitments on their regular books of account until the wool was actually received in the United States. Petitioner followed this same practice. There was considerable variation during the 1930's in the amount of its year-end advance wool purchase commitments, which were reported in the annual reports of its external auditors for the years 1931 to 1939 to have been as follows:

| Year | Yearend wool purchase commitments | Year | Yearend wool purchase commitments |
|------|-----------------------------------|------|-----------------------------------|
| 1931 | $272,579.90 | 1936 | $2,800,000.00 |
| 1932 | 125,041.00 | 1937 | [1] 265,000.00 |
| 1933 | 500,000.00 | 1938 | 815,000.00 |
| 1934 | 390,000.00 | 1939 | 1,540,000.00 |
| 1935 | 850,000.00 | | |

[1] Apparently included cotton.

Petitioner's unusually heavy advance wool purchase commitments at the end of the year 1936 exerted a substantial adverse effect on its profits for the year 1937 because carpet wool prices fell off rather sharply when general business conditions turned down during the last half of 1937. Under petitioner's then-current policy of valuing its inventories at the lower of cost or market, it became necessary to reduce the total carrying value of its inventories as of December 31, 1937, by $1,616,257.35 through a charge against income of that amount.

There were wide differences in the degree to which individual companies within the carpet industry specialized in different weaves of carpet over the period from 1922 to 1939, inclusive. There were also a number of major changes in the relative total volume of dif-

ferent types of carpet being sold from time to time. Ingrain carpets which had enjoyed great popularity prior to 1920 practically disappeared from the market by 1923 so far as rugs are concerned. No production of Brussels or ingrain carpets were reported by the Bureau of the Census after 1933 and no Smyrna rugs were reported after 1927. The volume of Axminster reached a peak in 1929, experienced a sharp decline in 1931, and thereafter recovered to a point above the 1929 level. The volume of Wilton was high through about 1927, declined in 1933, and thereafter showed increases to levels somewhat below the 1920's. The volume of tapestry velvet rugs and carpets was high in the census years prior to 1927, attained a peak in 1929, dropped in 1931, increased through 1937, and was still below previous levels in 1939.

Petitioner's production of Axminster in terms of square yards accounted for about 26 per cent of the total production of this type of carpeting in 1936 but such share of the total fell off progressively thereafter to about 20 per cent in 1939. Petitioner's share of the total production of Wilton was also undergoing a general decline during the base period years for its Wilton yardage fell off from about 24.4 per cent of the industry total in 1933 to about 8.6 per cent of such total in 1939. There was some offsetting improvement during the base period in petitioner's share of the industry total for velvet carpeting but petitioner's combined total yardage of all types fell off from 19.4 per cent of the industry total in 1936 to 17.2 per cent in 1939. Petitioner's relative competitive position was less favorable, on the average, for the base period years than it was for either the period from 1922 through 1929 or the period from 1930 through 1935.

Petitioner's profits in the years 1937, 1938, and 1939 were adversely affected in a notable degree as the result of price-cutting activities on the part of important members of the carpet industry. These price-cutting activities were associated with the introduction for the first time, about 1936, of an Axminster carpet containing only 4 rows of tufts to the inch. The cheapest grade of such carpet which had ever been marketed up to that time contained $4\frac{2}{3}$ rows of tufts to the inch. There were some major companies which did not see fit to make the 4-row Axminster but cut the price of their $4\frac{2}{3}$-row Axminster to avoid loss of volume from the new competitive products. Petitioner continued to maintain its $4\frac{2}{3}$-row product as the cheapest Axminster in its line and did not reduce its profit margin thereon to the same extent at least that some of its competitors did.

WHOLESALE PRICES OF COTTON AND JUTE CARPET YARNS AND OF BRUSSELS, WILTON, AND AXMINSTER CARPETS, 1913–1940

| Year | Wholesale prices at mill of— | | | | |
|---|---|---|---|---|---|
| | Cotton carpet yarn [1] | Jute carpet yarn [2] | Brussels, ¾ 5 frame | Wilton, ¾ 5 frame | Axminster ¾ |
| | Cents per pound | | Dollars per yard | | |
| 1913 | (3) | (3) | 1.29 | 2.41 | (3) |
| 1914 | (3) | (3) | 1.27 | 2.33 | (3) |
| 1915 | (3) | (3) | 1.30 | 2.43 | (3) |
| 1916 | (3) | (3) | 1.54 | 2.88 | (3) |
| 1917 | (3) | (3) | 1.84 | 3.42 | (3) |
| 1918 | (3) | (3) | 2.62 | 4.50 | (3) |
| 1919 | (3) | (3) | 3.41 | 5.41 | 2.99 |
| 1920 | (3) | (3) | 4.27 | 6.78 | 3.94 |
| 1921 | (3) | (3) | 3.55 | 5.43 | 3.27 |
| 1922 | (3) | (3) | 2.77 | 4.67 | 2.90 |
| 1923 | (3) | (3) | 2.99 | 4.99 | 3.28 |
| 1924 | (3) | (3) | 2.97 | 4.99 | 3.02 |
| 1925 | (3) | (3) | 3.15 | 5.25 | 3.10 |
| 1926 | 29.3 | 18.0 | 3.06 | 5.07 | 3 12 |
| 1927 | 28.9 | 16.0 | 2.98 | 4.84 | 3.12 |
| 1928 | 31.9 | 14.8 | 2.98 | 4.66 | 2.98 |
| 1929 | 31.2 | 14.9 | 2.98 | 4.57 | 2.88 |
| 1930 | 24.0 | 13.8 | 2.94 | 4.68 | 2.92 |
| 1931 | 16.9 | 11.7 | 2.49 | 3.93 | 2.28 |
| 1932 | 13.5 | 10.5 | 2.43 | 3.84 | 2.03 |
| 1933 | 21.5 | 11.4 | 2.41 | 3.92 | 2.08 |
| 1934 | 28.1 | 12 3 | 2.48 | 4.18 | 2.32 |
| 1935 | 27.3 | 12.3 | 2.54 | 4.29 | 2.43 |
| 1936 | 25.3 | 12.3 | 2.73 | 4.38 | 2.44 |
| 1937 | 25.9 | 12.6 | 2.75 | 4.52 | 2.37 |
| 1938 | 17.9 | 12.3 | 2.73 | 4.45 | 2.26 |
| 1939 | 20.3 | 13.0 | 3.01 | 4.56 | 2.33 |
| 1940 | ---------- | 14.9 | 3.11 | 4.84 | 2.63 |
| Averages: | | | | | |
| 1936–1939 | 22.4 | 12.6 | 2.80 | 4.48 | 2.35 |
| 1922–1939 | ---------- | ---------- | 2.80 | 4.54 | 2.66 |

[1] 8's, 3 and 4 ply, white warp twist, in single skeins, f.o.b. mill.  [2] No. 2, 14/16, f.o.b. mill.  [3] Data not available.

There has been an increasing degree of consumer preference for broadloom carpeting in wider and wider widths over a great many years as a result of a trend which began just before World War I and increased at a more rapid rate thereafter. According to information compiled by the United States Bureau of the Census, no velvet or Wilton rugs were made from strips after 1933 and no Axminster rugs made from strips were reported after 1927. The resulting decreases in the demand for rugs and carpets manufactured on narrow looms caused a substantial amount of manufacturing equipment in the carpet industry to become obsolete. There were a number of instances in which individual companies made substantial writeoffs of plant and equipment because of obsolescence which was concentrated over a relatively short period of years and reflected a failure to make adequate allowance for obsolescence in earlier years.

A substantial portion of the looms which petitioner had on hand immediately prior to its acquisition of the assets of Stephen Sanford and Sons, Inc., in November of 1929 was not usable for the manufacture of broadloom carpeting of any weave type. According to a

tabulation of the petitioner's looms which was made in October of 1926 there were then 1,045 narrow looms included in the grand total of 1,299. A number of these narrow looms became idle at least as early as 1926. Petitioner set up certain reserves on its accounting records in 1926 and 1927 through which it made special provision for obsolescence in the amounts of $95,749.58 in 1926 and $62,272.07 in 1927 with respect to obsolete looms and related equipment at its Thompsonville plant.

The petitioner made special provision in the early part of 1933 for a writeoff on its regular books of account of obsolete equipment at its Thompsonville plant by means of a charge against capital surplus of approximately $1,200,000. Another factor operating to reduce the total book value of petitioner's assets during 1933 was the sale of equipment located at Clinton having original cost value of approximately $1,690,000 at a loss (after taking reserves for depreciation and obsolescence into account) of approximately $570,000 as determined for tax return purposes. The net book value of petitioner's assets was further written down by approximately $4,500,000 as of January 1, 1935, through a charge against surplus and a corresponding increase in the amount carried as a reserve for depreciation and obsolescence on machinery and equipment.

Both petitioner's total assets and its total investment in productive facilities were substantially lower during the 1930's than during the 1920's. Its total assets as shown on the closing balance sheets incorporated in its tax returns averaged $46,735,135 for the years 1922 through 1929 and $36,644,876 for the years 1922 through 1939. The corresponding average for the base period years was $27,276,355.

There were several corporations included within the above-mentioned 14 members of the carpet industry which carried out important changes in management, operating facilities, and methods of distribution within the 18-year period from 1922–1939, inclusive. Such changes are normally made only after a rather extended period of consideration and study on the part of top management officials and frequently entail various kinds of special expenses to investigate or implement the new program involved, as well as a substantial disruption of normal business activities.

The permanent closing of petitioner's Clinton plant in March of 1933 was carried out for the purpose of improving petitioner's profit picture in the long run although substantial losses and expenses were incurred in connection therewith, including the payment of dismissal wages to Clinton plant employees in the approximate total amount of $100,000. Such closing took place only about 2½ years after petitioner's executive committee had authorized its officers to proceed with a major relocation of productive facilities among the three

plants then in operation. Such action entailed the appropriation of $350,000 on September 11, 1930, as the estimated cost of moving certain productive facilities to and from the Clinton plant. This relocation contemplated concentrating the production of all Jacquard carpet at Clinton and was carried out in about 1930.

Both petitioner (exclusive of Stephen Sanford and Sons, Inc.) and Mohawk had distributed their products largely through wholesale distributors prior to 1929. Petitioner and Mohawk continued this practice to about 1932 and thereafter established branch sales offices and warehouses throughout the country from which sales were made principally direct to retail dealers. Smith, which was petitioner's largest competitor, had long followed the practice of holding public auctions at irregular intervals for the purpose of selling off its accumulated inventories. Such practice was discontinued about 1928 or 1929 when Smith arranged for a large wholesaler of household furnishings, known as W. and J. Sloane, to act as its selling agent. Smith made a further change in its distribution policies in about 1938 when it purchased the rug and carpet sales division of Sloane.

Petitioner's decision to make sales principally direct to retail dealers from local warehouses and sales offices after about 1932 made it necessary for petitioner to carry a greater inventory than it had previously carried and increased the proportion of the total inventory which was represented by finished goods.

Petitioner's relative position in its industry constantly changed during the extended period 1933 to 1939. Trade institute reports of square yards produced, available from 1933 on, showed that over the period 1933 to 1939 petitioner's share of the entire industry fluctuated from a high of 21.8 per cent in 1934 to a low of 17.2 per cent in 1939 and, during the base period, varied from a high 19.4 per cent in 1936 to a low of 17.2 per cent in 1939. In terms of net sales of the 14 carpet companies, petitioner's share during the extended period 1922 to 1939 was 29.29 per cent and during the base period, 26.2 per cent. Petitioner's size, measured by net worth, changed substantially during the extended period 1922 to 1939.

During the period 1922 to 1939 petitioner's net sales per dollar of net fixed assets averaged $1.75 and in the base period, $2.83. Prior to 1931, approximately a third of petitioner's sales were made through wholesale distributors and the remaining two-thirds were sold direct to retailers. Commencing in 1933, the wholesale distributors were eliminated. Although this change in distribution may have resulted in some reduction in inventory turnover, petitioner's management found direct distribution very successful.

The carpet industry experiences slight seasonal variations between spring and fall. However, the seasonal factor had no material effect on annual data set out in these findings.

Sporadic factors experienced by petitioner during this period included strikes in 1921, 1926, and 1938. In its claim for relief under section 722(b)(1), petitioner alleged that it had sustained a loss of $200,000 during the 1938 strike, but it abandoned this claim before filing the petition. Strikes did not have any substantial or continuing effect on petitioner's profit pattern.

John F. Norman, who became president of petitioner (Bigelow Hartford Carpet Company) on July 16, 1924, was replaced on March 7, 1927. Although better personnel policies were adopted following his removal, there were no radical changes in policy and his removal had no material effect on petitioner's profit pattern.

Petitioner's business was not depressed during the base period by reason of conditions which generally prevailed in the woven wool rug and carpet industry subjecting petitioner to a profit cycle differing materially in length and amplitude from the general business cycle within the purview of section 722(b)(3)(A).

## OPINION.

Petitioner has the burden of proving that its own business was depressed during the base period by reason of conditions which generally prevailed in the woven rug and carpet industry subjecting it to a profit cycle differing materially in length and amplitude from the general business cycle. *Pabst Air Conditioning Corporation*, 14 T.C. 427 (1950). Petitioner points to the fact that its profits during the base period were 47.6 per cent of its average profits during the 1922–1939 period and the fact that the base period profits of 14 selected members of the carpet industry were 64.42 per cent of their 1922–1939 average. Petitioner contends that the condition generally prevailing in the carpet industry which subjected the industry to a profit cycle differing from the general business cycle was the influence of residential construction. With respect to the latter contention, it is petitioner's claim that residential construction intimately affected the carpet industry and was an important factor determining the level of business in that industry.

There is ample evidence that the profit level of petitioner's own business was depressed during the base period in relation to its average earnings over the extended period 1922–1939. However, petitioner unduly emphasizes the influence of the residential construction industry in this regard and fails to give consideration to other major factors which affected its level of earnings. For example, it is evident from the record that competitive developments

within the carpet industry itself were the primary cause for petitioner's depressed earnings during the base period.

For the extended period 1922–1939, petitioner maintained its level of production at the rate of 17.87 per cent of total carpet production in the United States and 29.29 per cent of the industry's net sales. During the base period, petitioner's production dropped to 16.44 per cent of the carpet industry while at the same time its net sales decreased to 26.23 per cent of that industry. One of the reasons for this change was that the carpet industry, except for petitioner and a few of its major competitors, introduced a new Axminster rug which contained four rows of tufted wool as compared to the old style of $4\frac{2}{3}$ rows of tufted wool per inch. Because of the reduction in the rows of tufted wool, it was possible to market the same style of rug at a competitively lower price than the old $4\frac{2}{3}$-row tufted wool Axminster rug could be marketed. The major competitors who, along with petitioner, continued to market the old Axminster rug, reduced their prices on that style of wool rug and thereby cut their profit margins. While petitioner did not cut its prices for the Axminster rug to the same extent as its major competitors, its profit percentage likewise suffered.

The effect of this competitive situation upon petitioner's profits is particularly significant in view of the fact that the industry as a whole was increasing productive efficiency while material and labor costs were below the average for the extended period 1922–1939. Total carpet production in the United States during the base period was 99.8 per cent of carpet production for the 1922–1939 extended period. During the same base period, actual wages in the industry averaged $3 million less and material costs averaged $400,000 less than in the 1922–1939 period. The value of the end product, wool rugs and carpets, showed an actual increase during the base period over the extended period. Petitioner's cost percentage of sales for the base period rose to 95.9 per cent as compared to 91.9 per cent for the 1922–1939 extended period.

The wool rug and carpet industry was also subject to competition from asphalted felt base and linoleum floor coverings. While the actual and relative value of production of wool rugs and carpets increased during the base period, their percentage of the market for floor coverings, in terms of yardage, declined. Petitioner's base period profits were affected by its decision to market under its own name a felt-base floor covering manufactured by another concern, which resulted in a loss to petitioner in the amount of $228,416. Petitioner also devoted a portion of its productive capacity to felt rug production during the base period.

In 1939 petitioner and a few other carpet manufacturers adopted the Lifo method of valuing inventories. The change by petitioner

resulted in an understatement of profits, with reference to its previous method of computing profits, of approximately $790,000. The above factors no doubt contributed to the lower level of earnings experienced by the petitioner during the base period. However, in order to prevail, the petitioner must prove that the depression of its own business was the result of a condition which prevailed in its industry subjecting the industry to a profit cycle differing materially in length and amplitude from the general business cycle. This it has failed to do, and the existence of the factors just described indicates that much of the depression in petitioner's business was the result of its own business decisions rather than to a condition generally prevalent in its industry. Petitioner alleges that the level of business in the carpet industry is largely determined by the level of activity in the residential construction industry and from this premise argues that the required qualifications for relief under section 722(b)(3)(A) are met.

However, we are not convinced from the evidence before us that the carpet industry business depended on the residential construction business to a much greater degree than did the level of business generally. The yearly average number of non-farm family dwelling units started during the base period was only 77.7 per cent of the average number started for the years during the 1922–1939 extended period. Average expenditures for residential construction during the base period were 66.6 per cent of the 1922–1939 average. While residential construction was at a depressed stage, the base period net sales of 14 members of the carpet industry averaged 104.58 per cent of the 1922–1939 extended period average net sales. Average carpet production during the base period in terms of square yards was only 0.2 per cent below the extended period average. The difference of 0.2 per cent production, plus the higher level of net sales, would indicate that the claimed relationship did not in fact exist.

Petitioner sought to prove the interrelationship between its industry and the residential construction industry with a series of correlations. However, the respective indexes which are compared by petitioner, for its purposes, are misleading. First, it seeks to establish the relationship between industries through the use of the correlations themselves. But correlation computations have no particular evidentiary value unless it is previously shown that there is some important relationship between the respective activities which are compared. Second, carpet production, in square yards, per residential unit started was actually greater during the base period, the years when petitioner's profits were depressed, than for the extended period. Also, comparison of expenditures for residential construction with loom hours bears no true relationship since productive

efficiency, in terms of loom hours, showed a marked improvement for the base period in comparison to the extended period whereas no similar improvement was shown to have occurred in the residential construction industry.

Petitioner has failed to prove that its business was depressed during the base period by reason of conditions which generally prevailed in the woven rug and carpet industry subjecting it to a profit cycle differing materially in length and amplitude from the general business cycle.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

